*362
 
 OPINION OF THE COURT
 

 Titone, J.
 

 Defendant was convicted of first degree manslaughter and two counts of first degree assault, primarily on the basis of an eyewitness’s Grand Jury testimony, which was admitted over vigorous defense objection. Although the witness had initially come forward and accused defendant, the witness subsequently left the State and refused to give trial testimony consistent with his earlier story. The issue on this appeal is whether there was sufficient evidence establishing that the witness had been intimidated by defendant to warrant the use of that witness’s Grand Jury testimony as part of the People’s direct case. Concluding that these facts must be established by no less than "clear and convincing evidence,” we hold that the People’s proof in this case sufficed to meet that standard.
 

 On April 20, 1990, following a brief argument in a Brooklyn nightclub, an individual named Anthony Gránese was fatally stabbed. Although many people were present in the club on the night in question, only one individual, Peter Terranova, came forward and identified defendant as the person who had wielded the knife. Terranova, who testified before the Grand Jury, stated that the incident had begun with a shoving match and had ended when defendant pulled a knife out of his waistband and stabbed Gránese in the chest. Terranova also stated that he saw defendant stab another individual, Rocky Giamportone. Giamportone himself was unable to identify the person who stabbed him.
 

 Immediately after the incident, some of the club patrons attempted to aid Gránese while others moved outside. According to Terranova, defendant also ran outside, was met by his brother, Frank Geraci, and the two men sped away in a white car. Some of the club patrons who had moved outside attempted to chase the car, throwing objects at it. One of those patrons later testified that he saw another of defendant’s brothers, Paul Geraci, fire a gun into the air, possibly wounding Anthony Gallo, another patron.
 

 Defendant was indicted principally on the basis of Terranova’s Grand Jury testimony. However, shortly before the trial was scheduled to begin, Terranova left his job and, without
 
 *363
 
 notifying his employer or his family, moved out of the State. After making contact with Terranova and learning that he did not wish to testify against defendant at trial, the prosecutor successfully sought a
 
 Sirois
 
 hearing
 
 [1]
 
 to establish the cause of Terranova’s change of heart and to obtain an advance ruling as to the admissibility of Terranova’s Grand Jury testimony.
 

 At the hearing, which was commenced on March 16, 1992, two police investigators testified for the People. According to these investigators, Terranova had given a detailed oral statement about the night of the stabbing and had subsequently given a sworn statement to an Assistant District Attorney. Although he had also met with the officers more than once before he gave his Grand Jury testimony, Terranova had never voiced any reluctance to testify.
 

 Soon after the Grand Jury indictment was handed up, Terranova told an investigating officer that defendant, who was at liberty, approached him and said something like: "You were there that night; I want you to come down to my lawyer’s with me.” As the date for the trial drew nearer, the investigating officers learned from Terranova’s mother that she had not seen her son in several months and did not know his whereabouts.
 

 Terranova subsequently called the investigators from Florida and told them: "they showed me my testimony, they showed [or shoved] it in my face.” He also asked the officer how "they found out about me” and stated that someone from the police or the District Attorney’s office "ratted on me.” Terranova expressed fear for himself and his family and told the officer that he would not be available for trial "if this is what it’s going to take to stay alive * * * and keep them away from [his] family.” He stated: "I know for sure I’m gonna have problems with it down the road if I testify * * *. But I don’t know if I’m gonna have problems with him the other way.” While he said he "hate[d] him” and wanted "to see him go to jail,” Terranova stated that he would not repeat the story he told the Grand Jury if he were required to testify at defendant’s trial.
 

 
 *364
 
 On March 5, 1992, Terranova appeared in New York pursuant to a material witness order. He met with police investigators at that time and identified a redacted police report as the document that he had been "showed [or shoved]” in his face. Terranova also told an investigator that a friend, whom he refused to identify, had intervened with the people who were coming "to break his legs.” At a subsequent meeting with investigators, Terranova stated that a friend of his had talked with defendant’s uncle in Harlem and that, as a result, he (Terranova) had received money "from them or from the defense.” He stated that he had already received $2,000 and was to receive an additional $250 per week until the trial was over, receiving a final lump-sum payment of $10,000 at the end. During this meeting with investigators, Terranova claimed that he had never seen the stabbing and had, in fact, been outside the club at the time of the incident.
 

 During his own
 
 Sirois
 
 hearing testimony, Terranova contradicted much of the officers’ statements. He denied having been threatened or approached by defendant about changing his testimony and stated that he had previously expressed fear only because of his desire to remain uninvolved in the case and because of his concerns about being prosecuted for perjurious Grand Jury testimony. With respect to the events on April 20, 1990, Terranova denied having seen the stabbing and, in fact, stated that he had been outside the club at the time it occurred.
 

 Finding that Terranova had been "markedly evasive” in his
 
 Sirois
 
 testimony, the hearing court concluded that
 
 "pressures
 
 had been brought to bear * * * making him unwilling to testify.” Accordingly, the court held that Terranova was "practically unavailable” because of his unwillingness to testify and that the People had satisfactorily established defendant’s responsibility for the circumstance. On that basis, the court concluded that Terranova’s sworn statements before the Grand Jury could be used as a substitute for his live testimony.
 

 In so ruling, the trial court rejected the defense’s contention, based on
 
 People v Banks
 
 (146 Misc 2d 601, 605-607), that a finding of culpability could not be reached unless the court first determined that the facts excluded all other hypotheses. Instead, the court opted for the standard set forth in
 
 People v Deegan
 
 (69 NY2d 976) for reviewing the sufficiency of Grand Jury evidence in a wholly circumstantial case. Finding that
 
 *365
 
 standard to be "more applicable than one imported from cases pertaining to a determination of a defendant’s substantive guilt,” the court stated that its review would be limited to whether the facts and inferences that logically flow from the evidence establish that Terranova’s unavailability was procured by defendant or by someone acting on his behalf. The court noted in an extended footnote, however, that it "would reach the same result even were [it] to analyze the evidence under [a] higher standard * * *, since [it could] exclude by clear and convincing evidence every other reasonable inference” (appellant’s appendix, at 406).
 

 Defendant’s subsequent jury trial resulted in a guilty verdict. On his appeal from the judgment of conviction, the Appellate Division upheld the trial court’s
 
 Sirois
 
 determination, holding that the People had met their burden of proof under the applicable "clear and convincing” evidence standard. In so ruling, the Appellate Division held that defendant’s personal meeting with Terranova, as well as the meeting between defendant’s uncle and Terranova’s friend, sufficed to satisfy that "clear and convincing evidence” standard.
 

 On this appeal, defendant once again raises the propriety of the People’s use of Terranova’s Grand Jury testimony as the centerpiece of their case-in-chief. Although he does not dispute the general principle that a witness’s Grand Jury testimony may be used in lieu of live testimony under certain circumstances, he contends that the foundation proof in his case fell short of what the law demands. Resolution of this claim requires that we explore the principles and standards that have led other courts to admit the out-of-court statements of witnesses who have become unavailable due to the defendant’s act.
 

 As a general rule, the Grand Jury testimony of an unavailable witness is inadmissible as evidence-in-chief
 
 (see, People v Green,
 
 78 NY2d 1029;
 
 People v Gonzalez,
 
 54 NY2d 729; CPL 670.10). However, the lower courts of this State, as well as the Federal courts, have adopted an exception to this rule where it has been shown that the defendant procured the witness’s unavailability through violence, threats or chicanery
 
 (see, Matter of Holtzman v Hellenbrand,
 
 92 AD2d 405,
 
 supra; United States v Thai,
 
 29 F3d 785, 814-815,
 
 cert denied
 
 — US —, 115 S Ct 456;
 
 United States v Aguiar,
 
 975 F2d 45, 47-48;
 
 United States v Potamitis,
 
 739 F2d 784, 788-789,
 
 cert denied
 
 469 US 918;
 
 United States v Mastrangelo,
 
 693 F2d 269, 272-
 
 *366
 
 273,
 
 cert denied
 
 467 US 1204;
 
 Steele v Taylor,
 
 684 F2d 1193,
 
 cert denied
 
 460 US 1053;
 
 United States v Thevis,
 
 665 F2d 616,
 
 cert denied sub nom. Evans v United States,
 
 456 US 1008;
 
 United States v Balano,
 
 618 F2d 624, 628-629,
 
 cert denied
 
 449 US 840;
 
 United States v Carlson,
 
 547 F2d 1346,
 
 cert denied sub nom. Hofstad v United States,
 
 431 US 914;
 
 see also, Reynolds v United States,
 
 98 US 145;
 
 cf., People v Hamilton,
 
 70 NY2d 987). In such situations, the courts have held, the defendant may not assert either the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of the witness’s out-of-court declarations
 
 (e.g., United States v Aguiar, supra,
 
 at 47;
 
 United States v Thai, supra,
 
 at 814;
 
 United States v Mastrangelo, supra,
 
 at 272-273).
 

 While the principle is often characterized as involving "waiver by misconduct”
 
 (United States v Mastrangelo, supra,
 
 at 273;
 
 accord, United States v Thevis, supra),
 
 it is more realistically described as a forfeiture dictated by sound public policy
 
 (see, Steele v Taylor, supra,
 
 at 1201, and n 8).
 
 [2]
 
 Indeed, the courts that have applied the rule have frequently justified it by invoking the maxim that the law will not " 'allow a person to take advantage of his own wrong’ ”
 
 (United States v Mastrangelo, supra,
 
 at 272, quoting
 
 Diaz v United States,
 
 223 US 442, 458). Additionally, the rule is invoked to "[protect] the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness”
 
 (Steele v Taylor, supra,
 
 at 1202). Like all of the other courts that have adopted and applied the rule, we conclude that out-of-court statements, including Grand Jury testimony, may be admitted as direct evidence where the witness is unavailable to testify at trial and the proof establishes that the witness’s unavailability was procured by misconduct on the part of the defendant.
 

 The more difficult question is what standard of proof should be required to establish a foundation for the admission of hearsay evidence under this rule. The Second and Sixth Circuits apply the relatively undemanding "preponderance of the evidence” standard
 
 (see, e.g., United States v Mastrangelo, supra,
 
 at 273 [2d Cir];
 
 Steele v Taylor, supra,
 
 at 1202 [6th Cir]).
 
 *367
 
 In contrast, the Fifth Circuit and the lower courts of this State have used the "clear and convincing evidence” standard
 
 (United States v Thevis, supra; Matter of Holtzman v Hellenbrand, supra).
 
 We conclude that the latter, more exacting standard, which is the one most protective of the truth-seeking process, should be adopted in this State.
 

 Because human fact finders lack the quality of omniscience, the process of determining the truth in adjudicative proceedings necessarily involves some margin of error
 
 (see,
 
 2 McCormick, Evidence § 341, at 445 [Strong 4th ed]). The size of the margin of error that the law is willing to tolerate varies in inverse proportion to the importance to the party or to society of the issue to be resolved. On one end of the spectrum are most civil disputes, where, from a societal standpoint, "a mistaken judgment for the plaintiff is no worse than a mistaken judgment for the defendant”
 
 (id.).
 
 On the other end are criminal determinations of guilt or innocence, "[w]here one party has at stake an interest of transcendent value”
 
 (Speiser v Randall,
 
 357 US 513, 525). The rules governing how persuasive the proof must be "[represent] an attempt to instruct the factfinder concerning the degree of confidence our society thinks * * * should [be had] in the correctness of factual conclusions for a particular type of adjudication”
 
 (In re Win-ship,
 
 397 US 358, 370 [Harlan, J., concurring]). Viewing the issue in light of this fundamental principle, we deem the "clear and convincing evidence” standard to be the test that best recognizes the gravity of the interest at stake and most effectively balances the need to reduce the risk of error against the practical difficulties of proving witness tampering.
 

 A determination that the defendant has procured a witness’s unavailability results in the admission of hearsay statements and the forfeiture of the right to cross-examine about the substance of those statements. Obviously, a defendant’s loss of the valued Sixth Amendment confrontation right constitutes a substantial deprivation. Additionally, and even more significantly, society has a weighty investment in the outcome, "[b]ecause of the intimate association between the right to confrontation and the accuracy of the fact-finding process”
 
 (United States v Thevis, supra,
 
 at 631).
 

 In this regard, it is significant that, unlike most exceptions to the rule against hearsay, the exception at issue here is justified not by the inherent reliability of the evidence
 
 (see, e.g., Ohio v Roberts,
 
 448 US 56;
 
 People v Arroyo,
 
 54 NY2d 567,
 
 *368
 
 571,
 
 cert denied
 
 456 US 979), but rather by the public policy of reducing the incentive to tamper with witnesses. Indeed, hearsay evidence such as the Grand Jury testimony at issue here is especially troubling because "although given under oath, [it] is not subjected to the vigorous truth testing of cross-examination”
 
 (United States v Thevis, supra,
 
 at 629;
 
 accord, United States v Salerno,
 
 937 F2d 797 [2d Cir]). Furthermore, Grand Jury testimony is often obtained through grants of immunity, leading questions and reduced attention to the rules of evidence — conditions which tend to impair its reliability
 
 (see, e.g., United States v Flores,
 
 985 F2d 770, 776, n 14 [5th Cir];
 
 United States v Fernandez,
 
 892 F2d 976, 981 [11th Cir];
 
 United States v Gonzalez,
 
 559 F2d 1271, 1273 [5th Cir];
 
 see also, Gamer v United States,
 
 439 US 936, 938 [Stewart, J., dissenting from denial of certiorari]).
 

 These factors militate in favor of a standard of proof that is high enough to assure a great degree of accuracy in the determination of whether the defendant was, in fact, involved in procuring the witness's unavailability for live testimony. While we recognize the need for the use of this less trustworthy class of evidence when necessitated by the defendant’s misconduct, we also believe that such use should be authorized only to the extent that the misconduct is clearly and convincingly shown.
 

 Finally, the use of a heightened standard of proof in this context is dictated by our State’s restrictive approach to the use of Grand Jury testimony as direct evidence in criminal trials. CPL 670.10 authorizes the use of a witness’s prior testimony under certain limited conditions, but does not list Grand Jury testimony among its "three carefully worded and enumerated exceptions”
 
 (see, People v Harding,
 
 37 NY2d 130, 134). This Court has previously held that the provisions of CPL 670.10 are exclusive
 
 (id.; People v Ayala,
 
 75 NY2d 422, 429) and that, consequently, Grand Jury testimony is generally inadmissible
 
 (People v Green,
 
 78 NY2d 1029,
 
 supra; People v Gonzalez,
 
 54 NY2d 729,
 
 supra).
 

 [3]
 

 Although we have carved out an exception to that general principle for cases in which the witness is unavailable because of the defendant’s wrongful conduct, our statutory and decisional law counsels a cautious
 
 *369
 
 approach that permits use of the exception only when the predicate facts are proven with the degree of certainty that the "clear and convincing evidence” test assures
 
 (see, Matter of Holtzman v Hellenbrand, supra,
 
 at 415, n 2).
 

 This is not to suggest that circumstantial evidence may not be used to establish, in whole or in part, that a witness’s unavailability was procured by the defendant
 
 (see, e.g., Steele v Taylor, supra).
 
 Circumstantial evidence is not a disfavored form of proof and, in fact, may be stronger than direct evidence when it depends upon "undisputed evidentiary facts about which human observers are less likely to err * * * or to distort”
 
 (People v Cleague,
 
 22 NY2d 363, 367;
 
 accord, People v Barnes,
 
 50 NY2d 375, 380;
 
 People v Harris,
 
 136 NY 423; McCormick, Evidence § 185, at 543, n 17 [Cleary 3d ed]). Further, given the inherently surreptitious nature of witness tampering, the proponent of Grand Jury testimony or other hearsay evidence will often have nothing more to rely upon than circumstantial proof. In light of the important policy considerations at stake, it would be unrealistic and unnecessarily rigid to adopt a formula that would make it impossible to establish the necessary foundation in so many cases.
 

 The evidence in this case provides an example of the type of circumstantial proof that suffices to satisfy the proponent’s foundational burden.
 
 [4]
 
 Unquestionably, defendant, who was out on bail during the months preceding his trial, had the opportunity to orchestrate Terranova’s intimidation. Further, a fact finder could infer from the proof before it that defendant had a strong motive for rendering Terranova unavailable to testify. Although his brothers may have been subject to criminal prosecution for their roles in the incident, defendant alone was on trial for intentional murder. Additionally, the evidence regarding the postindictment personal encounter between defendant and Terranova supports the inferences that defendant was aware both of Terranova’s value as a
 
 *370
 
 potential witness and of Terranova’s unwillingness to cooperate with the defense.
 

 The proof of defendant’s motive and opportunity were not the only circumstances from which an inference of defendant’s involvement could be drawn. There was evidence that Terra-nova had been confronted by an unidentified individual and shown a police document that recorded his accusation against defendant. There also was evidence that Terranova was to receive weekly payments for the duration of
 
 defendant’s
 
 trial and that he was to receive an additional $10,000 at the close of that trial. This evidence provided a logical basis for a fact finder to single out defendant rather than one or both of his brothers or some other interested party as the moving force behind the attempt to intimidate and bribe this witness.
 

 Moreover, Terranova’s own words to the investigators could rationally be construed to attribute his intimidation to defendant. Terranova’s statement to law enforcement officials that ”1 know for sure I’m gonna have problems with it down the road if I testify * * * [b]ut I don’t know if I’m gonna have problems with
 
 him
 
 the other way” logically pointed to defendant as the person responsible for Terranova’s evident fear. The witness’s additional statement that "I hate
 
 him\f\
 
 I wanna see
 
 him go
 
 to jail” lends support to the conclusions that the "him” Terranova referred to was defendant and that the strong feelings Terranova expressed were the product of the fear and resentment he felt against the person who had placed him in such jeopardy.
 

 Finally, the likelihood of defendant’s involvement was multiplied dramatically by Terranova’s
 
 Sirois
 
 hearing statements that it was defendant’s uncle who had offered more than $10,000 to keep Terranova silent for the duration of defendant’s trial. The existence of a financial arrangement made by defendant’s uncle that directly benefitted defendant was certainly a circumstance that bore directly on whether the intimidation and bribery had been initiated or approved by defendant.
 

 In short, the cumulative evidence and the inferences that logically flow therefrom were sufficient to support a determination by a rational fact finder, under the clear and convincing evidence standard, that defendant either was responsible for or had acquiesced in the conduct that rendered Terranova unavailable for trial. The trial court’s conclusion rested not merely on speculation and surmise, but rather on concrete
 
 *371
 
 facts from which its conclusions naturally and reasonably could be drawn
 
 (cf., People v Hamilton,
 
 70 NY2d 987). Accordingly, using the sufficiency standard appropriate for Court of Appeals review of the lower courts’ factual determinations, we find no basis to upset the trial court’s holding
 
 (see, People v Jennings,
 
 69 NY2d 103, 114-115).
 

 In this connection, we note our rejection of defendant’s contention that where the proponent’s foundational case rests exclusively on circumstantial evidence, the proof must exclude to "a moral certainty” every reasonable hypothesis other than the accused’s culpability
 
 (see, People v Banks,
 
 146 Misc 2d 601, 605-607,
 
 supra).
 
 That standard is used in connection with the fact finder’s resolution of the ultimate question of whether the accused’s guilt has been proven. It is, in fact, a specialized variant on the People’s burden of demonstrating guilt beyond a reasonable doubt
 
 (e.g., People v Barnes, supra,
 
 at 380-381;
 
 People v Kennedy,
 
 47 NY2d 196, 201-203;
 
 see, People v Jennings, supra,
 
 at 114-115). As such, as the trial court correctly held, it has no application in a situation like this, where the trier of fact is called upon to resolve a subsidiary evidentiary question and the burden of proof is measured by the lesser "clear and convincing evidence” test.
 

 Finally, because of the trial court’s statements about the standard for assessing the evidence, we find it necessary to comment briefly upon the difference between the standard for the initial determination of a disputed fact question and the standard that is mandated for purposes of appellate and CPL 210.20 (1) (b) review
 
 (see generally, People v Wong,
 
 81 NY2d 600, 608). In
 
 People v Deegan,
 
 69 NY2d, at 979,
 
 supra),
 
 on which the trial court relied, we held that even in a case involving wholly circumstantial Grand Jury evidence, the duty of the court reviewing the viability of an indictment is limited to "determining whether the facts, if proven, and the inferences that logically flow from those facts supply proof of every element of the charged crimes.” As is evident from the Court’s opinion in
 
 People v Jennings (supra,
 
 at 114-115), that formula is appropriate for judging the
 
 legal sufficiency
 
 of the circumstantial evidence — an inquiry that is used in appellate review of a jury verdict
 
 (see, People v Bleakley,
 
 69 NY2d 490, 495) as well as in a Grand Jury’s assessment of the prosecutor’s proof
 
 (see,
 
 CPL 190.65 [1] [a]) and in a trial-level court’s decision to sustain or dismiss an indictment
 
 (see,
 
 CPL 210.20 [1] [b]). It is
 
 not
 
 appropriate, however, for a trier of fact, whose function is to hear the evidence and reflect upon its persua
 
 *372
 
 siveness under the "reasonable doubt,” "clear and convincing evidence” or "preponderance of the evidence” standard.
 

 Thus, although the trial court was correct in its rejection of the "moral certainty” standard, it erred to the extent that it invoked the
 
 People v Deegan (supra)
 
 standard for the legal sufficiency of the circumstantial evidence before it. Since the court’s role on this preliminary question was not one of reviewing but rather of initial fact finding, it was bound to consider the circumstantial evidence as a whole and to determine for itself whether it was clearly and convincingly persuaded. This required something more than an assessment of whether defendant’s involvement was more probable than not and something less than a determination that all of the innocent inferences could be excluded to a "moral certainty”
 
 (see, People v Cleague, supra).
 
 It required a fact-based inquiry that is genetically different in kind from the legal assessment of whether the inference of guilt could be rationally drawn
 
 (see, People v Deegan, supra).
 

 However, despite the trial court’s erroneous use of the legal sufficiency standard, it is not necessary to reverse the judgment of conviction under the circumstances presented here. Although the court rested its primary analysis on the inapt
 
 Deegan
 
 standard, it was careful to note that it would have reached the same ultimate conclusion using even the most exacting standard. Indeed, the court expressly held that, after reviewing the evidence, it could "exclude by clear and convincing evidence every * * * reasonable” hypothesis other than defendant’s involvement in the loss of Terranova’s live testimony. In view of that alternative holding, it would be inappropriate for us to reverse.
 

 In sum, the trial court’s decision to admit the Grand Jury testimony of Peter Terranova was supported by the evidence and furnishes no ground for reversal. Defendant’s remaining contention — that evidence of his brother Paul’s conduct at the crime scene was erroneously admitted — was not preserved by a sufficiently specific objection.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Kaye and Judges Simons, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed.
 

 [1]
 

 . This type of hearing has been named after the defendant in
 
 People v Sirois,
 
 the criminal case that was considered in
 
 Matter of Holtzman v Hellenbrand
 
 (92 AD2d 405). In that case, the Second Department outlined the procedure to be followed "whenever the People allege specific facts which demonstrate a 'distinct possibility’ * * * that a criminal defendant’s misconduct has induced a witness’ unlawful refusal to testify * * * or has caused the witness’ disappearance or demise” (92 AD2d, at 415).
 

 [2]
 

 . A "waiver” ordinarily involves a conscious and voluntary relinquishment of a known right
 
 (see, e.g., Johnson v Zerbst,
 
 304 US 458, 464). While the concept arguably could be stretched to encompass this situation, the use of legal fictions is unnecessary here, since the seriousness of the misconduct, if proven, is certainly sufficient to justify the sanction of forfeiture.
 

 [3]
 

 . This strict position differentiates New York from Federal law, which, under certain conditions, allows the use of Grand Jury evidence under a catchall exception to the hearsay rule for "reliable” evidence
 
 (see,
 
 Fed Rules Evid, rule 804 [b] [5]).
 

 [4]
 

 . Although much of the People’s
 
 Sirois
 
 evidence consisted of out-of-court statements Terranova had made to investigators, the trial court concluded that the receipt of such hearsay was justified because the hearing concerned only the admissibility of evidence and because ” 'often the only evidence of coercion will be the statement of the coerced person, as repeated by government agents’ ” (appellant’s appendix, at 384, quoting
 
 United States v Batano,
 
 618 F2d 624, 629,
 
 cert denied
 
 449 US 840,
 
 supra; see also, United States v Mastrangelo, supra,
 
 at 273;
 
 People v Banks,
 
 146 Misc 2d 601, 603,
 
 supra; People v Sweeper,
 
 122 Misc 2d 386, 387). The hearsay problem identified by the court has not been raised by the parties in this appeal.