OPINION OF THE COURT
Gloria M. Dabiri, J.
The defendant Carol Straker is charged by the above-referenced indictment with murder in the second degree, as *950 sault in the first degree and related crimes. The People contend that on September 6, 1995 the defendant entered a grocery store with a firearm, shot Alwyn Smith in his leg and shot June Thompson in her face causing Thompson’s death. The People contend that the motive for the shootings was an ongoing dispute between Thompson and Straker over their mutual boyfriend, Frank Wray. The People seek to introduce into evidence on its case-in-chief at trial the Grand Jury testimony, a sworn audiotaped statement and other out-of-court statements made by Alwyn Smith to law enforcement officials. The People contend that Alwyn Smith, their only eyewitness, is unavailable to testify as a result of misconduct by the defendant and those acting on her behalf. At a Sirois-Geraci hearing (Matter of Holtzman v Hellenbrand, 92 AD2d 405, 415 [2d Dept 1983]; People v Geraci, 85 NY2d 359 [1995]) the People called: Detective John Kristoffersen; Lorraine Thompson; Police Officer Lesley Honore; Assistant District Attorney Maria Leonard!; Investigator Christopher Larney; and Assistant District Attorney Jeffrey Levitt. The defendant called as a witness Valerie Macey. A Kings County District Attorney action sheet and the memo book entries of Police Officer Leslie Honoré were received in evidence. The court also reviewed the transcript of pretrial suppression hearings.
FINDINGS OF FACT
The court makes the following findings of fact for the limited purpose of the Sirios-Geraci hearing: The defendant Carol Straker, the witness Alwyn Smith, the deceased June Thompson, and Frank Wray at one time all resided in Guyana. Smith knew both the defendant and the deceased when they lived in Guyana. Frank Wray is the owner of an apartment building located at 1455 Saint John’s Place in Brooklyn. On the ground floor of the building is a grocery store, a barber shop and a beauty salon. The beauty salon is operated by the defendant and the grocery store by Wray. Alwyn Smith leases an apartment in the building and worked in the grocery store. Wray resides with the defendant and is the father of her four children. Wray also had an ongoing romantic relationship with the deceased. As a result there had been friction between the two women for many years.
On September 6, 1995, at the scene and within minutes of the shooting, Alwyn Smith told Police Officers Leslie Honoré and Lament Davis that it was the dark-skinned woman who had shot him. The defendant was visibly darker skinned than *951 the deceased. Two hours after the shooting, at Kings County Hospital, Smith told Detective Kristoffersen that the defendant entered the grocery store, pulled out a gun and shot him, that he fled the store to summon the police, that upon leaving he heard several more shots, and that he then saw the shooter exit the grocery store and enter the beauty salon. Smith also told Kristoffersen that the person who shot him owned the hair salon next door to the grocery store. Smith looked at Thompson, who was also at the hospital, and told Kristoffersen that "It was the other one, 'Carol’ ”, who had shot him. At about 4:25 a.m. the next day, at the 77th Precinct, Smith repeated his version of the events to Detective Kristoffersen and through a one-way mirror identified Carol Straker as the shooter. Smith also gave a sworn, audiotaped statement to an Assistant District Attorney.
On the day of the shooting, Detective Kristoffersen interviewed the defendant. The defendant was advised of her constitutional rights, indicated that she understood and agreed to answer questions. The defendant stated, inter alia, that at approximately 3:00 p.m. that day she went into the storage room of the grocery store to retrieve supplies for her beauty salon and while she was there Thompson arrived and hit her on her head with a bottle. According to the defendant, Thompson pulled a black object from her bag, and while they struggled for control of the object two shots went off. The defendant said that after the second shot she felt a burning sensation and noticed a wound to her hand. The defendant told Detective Kristoffersen that only she, Thompson and Smith were in the store during the incident.
The following day the defendant, who was incarcerated, telephoned Smith at his home. She requested that Smith change his story to match hers "just to make sure everything goes okay.” She asked him to tell the police that Thompson had the gun. On September 11, 1995 Alwyn Smith testified before a Kings County Grand Jury. His testimony was consistent with his earlier statements. Smith told the Grand Jury about the telephone call from the defendant. Approximately three weeks later Police Officer Honoré saw Smith on the street. Smith told him: "They are still trying to get [me] not to testify * * * they offered me money.”
In early October 1995 the defendant was released from jail on $50,000 bond. On October 3, 1995 an Assistant District Attorney spoke with Alwyn Smith by telephone. Smith once again described the telephone call from the defendant and requested *952 an order of protection. Smith told the Assistant District Attorney that he felt uncomfortable residing in a building owned by the defendant’s boyfriend and in which the defendant operated a business. He stated that he wished to relocate and expressed concern about medical coverage and loss of wages. On October 6, 1995, when the defendant appeared in Supreme Court, Part 41, a temporary order of protection was issued on behalf of Alwyn Smith. On November 8, 1995 the Assistant District Attorney again spoke with Smith. Smith indicated that he was "very concerned” that the defendant’s family members and/or friends had been visiting him at his home and that he was feeling "very pressured about not testifying”. He again indicated that he needed assistance in relocating. When asked whether he had been threatened, Smith replied: "[Y]ou know what it’s like living in someone’s building and having to be in this type of position.”
Assistant District Attorney Jeffrey Levitt, along with detectives, made an unannounced visit to Smith’s apartment on March 22, 1996. Smith willingly described the incident, consistent with his prior statements. During this interview Levitt, who had been advised that Smith was unwilling to testify, did not discuss with Smith the possibility of testifying at trial. However, on May 2, 1996, Levitt spoke with Smith regarding testifying before a Grand Jury in order to obtain a superseding indictment. Smith "was absolutely adamant about refusing to testify,” and stated to Levitt more than 25 times during their conversation: "I’m scared, man. I’m scared”. Levitt advised Smith that if he was afraid, the District Attorney’s Office would assume the cost of having him relocated. However Smith declined, stating that he wanted to be near family members who lived in the area and that he could not afford to pay rent at a different location. Following this conversation, Levitt asked both Kristoffersen and Lorraine Thompson, the sister of the deceased, to speak with Smith and to encourage him to testify.
Shortly thereafter, Lorraine Thompson spoke with Smith by telephone. Smith told her that as a result of the injury to his leg, he was unable to work and that, as a con sequence, he was experiencing financial problems. Smith said that "[h]e had bills to pay, he had kids to take care of, and that he doesn’t have money.” He repeated this several times. Thompson told him that she did not have money to offer him and that all she was asking is that he come to court and say exactly what took place. Smith indicated that he did not know whether he would *953 come to court. In late July or early August 1996 Valerie Macey, a close friend of the defendant, saw Smith and asked him about the shooting. Another friend of the defendant named Karen was also present. According to Macey, Smith told them: "I messed up, I messed up. I shouldn’t have said that.”
When the defendant appeared in court on December 3, 1996 defense counsel, who had previously been unavailable, declared his availability for trial and the case was scheduled for January 21, 1997. Also in December Detective Kristoffersen spoke with Smith who continued to express reluctance to testify. Smith told the detective that "things were just all screwed up” in that he knew both the defendant’s and the deceased’s families, and that he recently had returned from his mother’s funeral in Guyana and while there had a conversation with his sister. Smith told Kristoffersen that he had come to the realization that the matter "will all be handled by the man upstairs” and that the defendant "would stand before a higher court up in heaven.” Later, Kristoffersen attempted to contact Smith. He spoke with Smith’s brother who indicated that he was unsure where Smith was.
Thereafter Levitt spoke, via telephone, with Smith. Once again Smith said that he was afraid and would not testify. During their telephone conversations Smith pointed out that he had been shot by the person against whom he would be testifying, that that person was out on bail and ran a business in the building in which he lived, that her common-law husband owned the building, that he sees both of them regularly, and that he was afraid.
Christopher Larney, an investigator with the Office of the District Attorney, went to Smith’s home on several occasions in an attempt to speak with him. On one such occasion, in February of 1997, he spoke with Osmond Smith, Alwyn’s brother. Osmond told Larney that in December 1996 Alwyn went to Guyana for an indefinite stay and that he was "watching” Alwyn’s apartment. He also stated that his brother’s belongings had remained in the apartment and that someone who lived in the building was paying the rent.
At the time of the Sirios-Geraci hearing evidence was introduced that Department of Motor Vehicles searches and a financial investigation had failed to reveal Smith’s whereabouts; and that a check with the United States Embassy in Guyana and the Immigration and Naturalization Service in Guyana had proved fruitless. Neither agency had any record of Smith entering Guyana. Thereafter, the People’s investigation, *954 which included contact with the Guyanese Police, persons in Guyana who knew Smith, as well as British Airlines, revealed that Smith had purchased an airline ticket to Guyana on December 28, 1996 and left New York on December 31, 1996, and that on March 14, 1997 he was spotted in Guyana by one of the People’s civilian contacts.
DISCUSSION
As a general rule, prior statements of a witness are inadmissable as evidence-in-chief on the People’s case when offered for their truth. (People v Geraci, 85 NY2d 359, 365 [1995], supra, citing People v Green, 78 NY2d 1029 [1991]; People v Gonzalez, 54 NY2d 729 [1981]; CPL 670.10.) However, by statute, New York has modified the common-law rule precluding the admission at trial of a witness’ testimony given at a prior proceeding. Specifically, CPL 670.10 (1) permits the introduction of a witness’ testimony at a prior trial, preliminary hearing (CPL 180.60) or conditional examination (CPL art 660), provided that the witness is "unable to attend” the subsequent proceeding because of "death, illness or incapacity” or (because the witness) cannot with due diligence be found. Moreover, the Court of Appeals in People v Robinson (89 NY2d 648 [1997]) recently held that due process requires the introduction in evidence of exculpatory hearsay material (Grand Jury testimony) where a defense witness is unavailable and the witness’ hearsay statement has sufficient indicia of reliability. The Court of Appeals, following a line of Federal and lower court cases, has adopted another exception to the rule when, as argued in this case, it can be established that the defendant procured the witness’ unavailability through violence, threats or chicanery. (People v Geraci, supra, at 365, citing, inter alia, United States v Thai, 29 F3d 785, 814-815 [2d Cir 1994], cert denied sub nom. Lan Ngoc Tran v United States, 513 US 977 [1994]; Matter of Holtzman v Hellenbrand, 92 AD2d 405, supra; United States v Aguiar, 975 F2d 45, 47-48 [2d Cir 1992].) Under such circumstances a defendant is not permitted to profit from her own wrongdoing and by her misconduct is deemed to have forfeited the right to confront the witness against her. The Second Circuit Court of Appeals in United States v Mastrangelo (693 F2d 269, 272-273 [2d Cir 1982]) noted: "[T]he right of confrontation may be waived not only by consent but 'at times even by misconduct.’ * * * 'Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong.’ Thus, if a witness’ silence is procured by the defendant *955 himself, whether by chicanery * * * by threats * * * or by actual violence or murder * * * the defendant cannot then assert his confrontation clause rights in order to prevent prior grand jury testimony of that witness from being admitted against him. Any other result would mock the very system of justice the confrontation clause was designed to protect” (citations omitted). Similarly, our Court of Appeals stated in Geraci: "[T]he principle * * * is more realistically described as a forfeiture dictated by sound public policy * * * [T]he rule is invoked to '[protect] the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness’ * * * [W]e conclude that out-of-court statements, including Grand Jury testimony, may be admitted as direct evidence where the witness is unavailable to testify at trial and the proof establishes that the witness’s unavailability was procured by misconduct on the part of the defendant.” (85 NY2d, at 366.)
In People v Geraci (supra), the Court emphasized that "unlike most exceptions to the rule against hearsay, the exception at issue here is justified not by the inherent reliability of the evidence * * * but rather by the public policy of reducing the incentive to tamper with witnesses.” (85 NY2d, at 367-368; see also, People v Maher, 224 AD2d 549 [2d Dept 1996], affd 89 NY2d 456 [1997].) Owing in part to the unreliability of such evidence, the Court of Appeals determined that the standard of proof required as a precondition to admission of such evidence is that of clear and convincing proof. (85 NY2d, at 367.) Rejecting the preponderance of evidence standard applied by some Federal courts (see, United States v Mastrangelo, 693 F2d 269, supra), the Geraci Court reasoned that a "clear and convincing evidence” standard for determining misconduct best recognizes the gravity of the interest at stake (a determination of guilt or nonguilt) and most effectively balances the need to reduce the risk of error against the practical difficulties of proving witness tampering. (85 NY2d, at 367.)
Circumstantial evidence may be used by the proponent of the hearsay evidence to meet the "clear and convincing” standard. In Geraci the Court noted "[circumstantial evidence is not a disfavored form of proof and, in fact, may be stronger than direct evidence when it depends upon 'undisputed evidentiary facts about which human observers are less likely to err * * * or to distort’ [citations omitted] Further, given the inherently surreptitious nature of witness tampering, the proponent of Grand Jury testimony or other hearsay evidence will often *956 have nothing more to rely upon than circumstantial proof. In light of the important policy considerations at stake, it would be unrealistic and unnecessarily rigid to adopt a formula that would make it impossible to establish the necessary foundation in so many cases” (85 NY2d, at 369, supra; see also, People v Cotto, 169 Misc 2d 194, 197 [Sup Ct, NY County 1996]). The Court specifically rejected the contention, made by defendant herein, that where the proponent’s foundational evidence is circumstantial, the proof must exclude to "a moral certainty” every reasonable hypothesis other than the accused’s culpability. (85 NY2d, at 371.) That standard, the Court noted, is in fact a specialized variant on the People’s burden of demonstrating guilt beyond a reasonable doubt and as such is to be used by the fact finder only in resolving the ultimate question of whether guilt has been established at trial. (Supra.) This does not mean, however, that a finding of misconduct can rest solely upon speculation and conjecture, or suspicion as to the defendant’s involvement in a witness’ refusal to testify (People v Hamilton, 127 AD2d 691, 692-693 [2d Dept 1987], affd 70 NY2d 987 [1988]; People v Brown, 166 Misc 2d 539, 546 [Sup Ct, Kings County 1995]).
Moreover, the Geraci holding liberalized the types of extrajudicial statements that can be admitted providing that the clear and convincing standard is met. Since the rule of admissibility is based not upon the inherent reliability of the hearsay (as is CPL 670.10) but rather, the public interest in deterring witness tampering, a hearing court need not consider whether the offered extrajudicial statement is inherently reliable. (85 NY2d, at 366, 367-368, supra.) The Geraci Court’s concern for use at trial of such potentially unreliable evidence, which may not have been sworn and may not have been subject to the vigorous truth-testing of cross-examination, is reflected in the Court’s adoption of a heightened standard of proof, requiring that the predicate facts supporting admissibility "are proven with the degree of certainty that the 'clear and convincing evidence’ test assures” (85 NY2d, at 368-369, supra). Thus, Grand Jury testimony (People v Geraci, 85 NY2d 359; People v Delarosa, 218 AD2d 667 [2d Dept 1995]); unsworn statements (People v Cotto, 169 Misc 2d 194, 202, supra; People v Maher, 89 NY2d 456, supra; Devonshire v United States, 691 A2d 165 [DC Cir 1997]; United States v Aguiar, 975 F2d 45, supra); and audiotaped statements (see, People v Brown, 166 Misc 2d 539, supra) have all been found to be admissible once the burden of proof for establishing misconduct has been met.
*957 CONCLUSION
The cumulative evidence and the inferences which logically flow therefrom support a conclusion, by clear and convincing evidence, that defendant both engaged in conduct herself, and acquiesced in conduct by others, that rendered Alwyn Smith unavailable to testify for the prosecution at trial. (People v Geraci, 85 NY2d, supra, at 370; People v Delarosa, 218 AD2d 667, supra.) The defendant was aware of Smith’s value as a prosecution witness and was the only individual who stood to benefit from the intimidation and bribery of Smith into not testifying. Her complicity in the scheme to do so is directly evident by her telephone call to Smith, from jail the day following the shooting, requesting that he change his story to match hers. Moreover, the defendant, a business owner who was out on bail for some 16 months awaiting trial, had both the means and opportunity to orchestrate Smith’s bribery and intimidation. (See, People v Geraci, 85 NY2d, at 369; People v Cotto, 169 Misc 2d, supra, at 201.) A few weeks after his Grand Jury appearance Smith reported to a police officer: "They are still pressuring me not to testify * * * They offered me money.” Smith received visits at his home from defendant’s friends and/or family members, who "pressured him into not testifying”. He requested and received an order of protection against the defendant. Thereafter, Smith repeatedly told prosecutors that he was afraid and that he would not testify. He indicated that he was not at ease residing in a building in which the defendant, who had shot him, also operated a business. He, nevertheless, declined assistance in relocating because of his inability to pay rent at a new location. The credible evidence is that Smith who had been employed in a business operated by the defendant’s paramour, Frank Wray, and who resided in a building owned by Wray, was dependent upon Wray for both income and housing. The evidence is that due to the injury he sustained when the defendant allegedly shot him, Smith was unable to work, that he was experiencing financial hardship as a result and that he was not paying rent due to Wray. The evidence is that he, and later his brother Osmond, nevertheless continued to reside in the apartment, and that a few weeks before the scheduled trial date Smith, who was indigent, purchased an airline ticket to Guyana and fled. (See, United States v Mastrangelo, 693 F2d 269, 273, supra; People v Serrano, 227 AD2d 352 [1st Dept 1996], lv denied 89 NY2d 867 [1996]; compare, People v Hamilton, 70 NY2d 987, 988 [1988], supra.)
*958 Accordingly, Smith’s Grand Jury testimony and sworn audiotaped statement are admissible in evidence on the People’s case-in-chief. Smith’s statement to police at the scene immediately following the shooting is arguably admissible as a spontaneous declaration or excited utterance. (People v Brown, 70 NY2d 513 [1987].)