OPINION OF THE COURT
John M. Leventhal, J.
The issue of first impression to be determined by this court is whether a defendant can forfeit his statutory right to a speedy trial. This question is answered in the affirmative.
procedural history
The defendant had moved this court to dismiss the indictment on statutory speedy trial grounds (CPL 30.30). The People filed opposition papers. After oral argument, this court granted a hearing to determine the reasons for the 182-day delay from December 10, 1997 until June 10, 1998. (People v Salazar, NYLJ, Nov. 17, 1998, at 32, col 3.) The People argue that defendant’s conduct was intended to and did in fact cause the complainant, defendant’s former girlfriend, to refrain from testifying at trial or before the Grand Jury on the resubmission of certain counts. The defendant maintains that the People failed to use due diligence to secure the complainant’s attendance.
SPEEDY TRIAL TIME
The court notes that the applicable six-month speedy trial time consists of 183 days.[1] The adjournment from defendant’s arraignment dates in criminal court (Apr. 16, 1997 under docket 97K030616 and Apr. 26, 1997 under docket 97K033326) until May 22, 1997, the date the People filed their statement of *130 readiness, is charged to the People, a matter of 36 days as to counts one through seven and 26 days as to counts eight through eleven.[2] (People v Correa, 77 NY2d 930; People v Kendzia, 64 NY2d 331; People v Hamilton, 46 NY2d 932.)
On November 5, 1997, the court dismissed counts one through four of the indictment with leave granted to the People to re-present.[3] A number of serious crimes survived dismissal, namely, sodomy in the first degree (two counts) and criminal contempt in the first degree (three counts).
FORFEITURE OF STATUTORY SPEEDY TRIAL RIGHT
Courts have consistently denied a defendant’s motion to dismiss an indictment on statutory speedy trial grounds when the defendant’s acts or conduct had caused the delay (see, People v Singletary, 54 AD2d 767; People v Ellis, 123 Misc 2d 544; People v Rupp, 75 Misc 2d 683; CPL 30.30 [4] [g]). This court observes that a different analysis is in order, namely, whether a defendant forfeits his statutory right to a speedy trial when his conduct is the cause of the delay.
Courts have held that a defendant may forfeit her constitutional right to be present at her trial and sentence (People v Sanchez, 65 NY2d 436; Taylor v United States, 414 US 17), as well as her right of confrontation and her right to assert an evidentiary objection against the admission of a witness’ out-of-court declarations due to a defendant’s misconduct. (People v Cotto, 92 NY2d 68, 76; People v Geraci, 85 NY2d 359, 366; Steele v Taylor, 684 F2d 1193, cert denied 460 US 1053; compare, cases cited, supra, with Matter of Holtzman v Hellenbrand, 92 AD2d 405; United States v Mastrangelo, 693 F2d 269, 273, cert denied 467 US 1204; United States v Thevis, 665 F2d 616, cert denied sub nom. Evans v United States, 456 US 1008 [where principle is characterized as “waiver by misconduct”].) A defendant may even forfeit his right to counsel under appropriate circumstances (People v Gilchrist, 239 AD2d 306, lv denied 91 NY2d 834) and his right to have a motion (People v Panico, 130 AD2d 777, 778) or appeal (People v Del Rio, 14 NY2d 165, 169) heard and decided.
“A ‘waiver’ ordinarily involves a conscious and voluntary relinquishment of a known right (see, e.g., Johnson v Zerbst, *131 304 US 458, 464).” (People v Geraci, 85 NY2d, at 366, n 2, supra.) “Forfeiture, unlike an express waiver which involves an evaluation of defendant’s state of mind, occurs by operation of law and as a matter of public policy (see, People v Thomas, 53 NY2d 338, 342-343, n 2; see also, Westen, Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure, 75 Mich L Rev 1214, 1239, n 50 [1977])” (People v Sanchez, 65 NY2d, at 443-444, n, supra).
The People’s ability or readiness to proceed to trial may not be thwarted by a defendant’s conduct that prevents the trial from going forward. (Taylor v United States, 414 US, at 20, supra, citing Illinois v Allen, 397 US 337, 349.) The law will not “ ‘ “allow a person to take advantage of his own wrong” ’ ”. (People v Geraci, 85 NY2d, at 366, supra, citing United States v Mastrangelo, 693 F2d, at 272, supra, quoting Diaz v United States, 223 US 442, 458.) “[T]he rule is invoked to ‘[protect] the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness’ ”. (People v Geraci, supra, at 366, quoting Steele v Taylor, 684 F2d, at 1202, supra.)
There are powerful public policy considerations involved in not permitting an accused to take advantage of his own conduct in obstructing or impeding a complainant from coming forward to testify before either a Grand Jury or petit jury. This public policy is especially strong in cases involving allegations of domestic violence. When the accused and the complainant either had or continue to have an intimate relationship, the potential for abuse and manipulation of the complainant and the criminal justice system itself is great as the accused may exert power and control over his or her partner. Acts that are aimed to coerce and to intimidate may constitute a separate crime (see, e.g., Penal Law §§ 215.11, 215.15). Conduct that may not rise to criminal behavior may nonetheless be improper amounting to a forfeiture of a right. (People v Major, 251 AD2d 999.) This court holds that a defendant’s misconduct causing delay in Ms trial may, under appropriate circumstances, trigger a forfeiture of his right to a speedy trial under CPL 30.30.
SIROIS HEARING
At the Sirois hearing held over a four-day period, both the complainant and the defendant testified.
The complainant, Emilia Palacio, testified that on April 14, 1997, both she and the defendant were arrested and charged with crimes against each other. Defendant was alleged to have *132 committed sexual acts upon complainant while she was unconscious.[4] The complainant had allegedly stabbed the defendant in the stomach. The defendant and the complainant through their respective attorneys withdrew their cross CPL 190.50 notices to testify before the Grand Jury. There apparently was either a tacit or overt agreement between the defendant and complainant and their attorneys not to proceed with the respective felony complaints. On April 25, 1997, however, the defendant was rearrested based on allegations that he violated the protective order issued in the aftermath of the April 14, 1997 incident. Complainant then testified before the Grand Jury on May 1, 1997 regarding both incidents, namely, April 14, and April 23-25, 1997. Complainant represented her residence address to be 90 Schenck Avenue, Brooklyn, New York, on May 1, 1997. She stated to the Grand Jury that her mother’s residence was 40-19 99th Street in Queens.[5]
In about May 1997, the complainant was kicked out of her mother’s home ostensibly because her mother was annoyed that the complainant was proceeding with the prosecution of the defendant. Ms. Palacio testified that she was “homeless” from May until November 1997 staying with her best friend Anthony Mendez for part of this time. The complainant returned to live with her mother in November 1997. She lived there until February 1998 when detective investigators from the District Attorney’s Office met with her. After speaking to the assigned Assistant District Attorney on the telephone, the complainant again left her mother’s house to stay with Mr. Mendez for approximately three or more weeks. At no time did the complainant inform the District Attorney’s Office that she moved from her apartment to her mother’s house or to Mr. Mendez’s house. She never provided the People with a new address nor informed them that she had moved.
The complainant testified that she did not come forward to cooperate in the prosecution since May 1997 until some time *133 after this motion to dismiss was filed on June 8, 1998 because her mother was being harassed by defendant and he had written her letters which had frightened her.
The complainant initially claimed that the defendant and/or his friends had harassed her mother into convincing complainant not to go forward with this prosecution. It was established, however, that the defendant had loaned the complainant’s mother $240 to pay the rent in March 1997, a date prior to the charges against the defendant being brought. This money was to be repaid by May 1997. The complainant testified that her mother did not want to be bothered at all by the criminal proceeding and wanted the complainant to drop the charges. The complainant, however, acknowledged that she did not know whether the defendant had anything to do with her mother’s attitude.
The complainant’s mother did not testify even though the People initially intended to call her as a witness and despite her presence in the courthouse on at least one day of the hearing. Upon the defendant’s request that an adverse inference be drawn as the complainant’s mother should be considered a missing witness, the People represented that the complainant’s mother would not be able to establish that the defendant caused the complainant to stay away from participating in the prosecution or that the defendant told the mother to tell complainant to stay away or he would get her. The People conceded that had the mother testified, she would be unable to support the complainant’s testimony that her mother was threatened. Complainant’s mother would only be able to testify that her only conversations with defendant or his friends concerned the money that she had borrowed from the defendant.
Defendant mailed several letters to the complainant addressed to her mother’s house prior to posting bail in July 1997. The letters are dated April 28, May 9, May 15, May 20, June 5 and June 10 (two or three letters). In addition, the defendant wrote two letters to complainant’s mother both dated September 10, 1997. It is clear that the sending of these letters could and can still form the basis for an additional charge of criminal contempt in the second degree for each letter. (Penal Law § 215.50 [3].) No letter contains an explicit threat. The court notes that the complainant did not receive these letters addressed to her mother as well as those that were addressed *134 to her until sometime after January 1998.[6] The complainant stated that had she known the scheduled court dates listed in the September 10, 1997 letter to her mother, she would have appeared in court.[7]
The complainant admitted visiting the defendant while he was incarcerated at Rikers Island and the Brooklyn House of Detention. She purchased items and gave cash to the prison commissary for defendant’s use in partial payment of her mother’s debt to the defendant.[8]
The defendant testified that the complainant had visited him approximately 15 times while he was incarcerated. The defendant testified (and the complainant agreed) that complainant wrote him on five or six occasions in response to his letters. The complainant confirmed that she had in her possession several of these letters although she could not locate some of them. Yet, the complainant was unable to produce those letters for the court’s inspection even though the hearing was adjourned on two occasions expressly for their production. The court notes that the complainant appeared in court in June 1997 at one of defendant’s calendar appearances at a time when almost all, if not all, of the letters addressed to her had been posted.
It is clear by her own testimony that the complainant did not feel threatened by these letters, e.g., she stated that she would have come to court had she received the letters prior to January 1998 and she did in fact appear in court in June 1997, a date after the letters addressed to her had been posted.[9]
The court notes that the complainant indicated that she may have had other motives for not coming to court. She was concerned that the charges against her would be restored. In addition, the complainant had an altercation with a “Mookie”, defendant’s then girlfriend on October 16, 1997. Complainant was accused of “assault” and given a DAT. She was unsure whether her disposition was a conditional discharge or an ACD. Mookie received a one-year order of protection against the complainant.
*135 The court notes that there is a divergence of opinion on what the People’s burden ought to be in demonstrating that the defendant, by “violence, threats or chicanery, caused a witness’s unavailability.” (People v Cotto, 92 NY2d 68, 76, supra; People v Geraci, 85 NY2d 359, 367, supra; Matter of Holtzman v Hellenbrand, 92 AD2d 405, 414, 415, supra.) The Second and Sixth Circuits declare the burden to be by a “preponderance of the evidence” even where a defendant’s constitutional right is sought to be forfeited. (United States v Mastrangelo, 693 F2d 269, 273 [2d Cir], supra; Steele v Taylor, 684 F2d 1193, 1202 [6th Cir], supra.) The Fifth Circuit and the Court of Appeals, however, have employed the “clear and convincing standard”. (United States v Thevis, 665 F2d 616, supra; People v Geraci, 85 NY2d, at 367, supra; People v Cotto, 92 NY2d, at 75-76, supra.)
In the matter sub judice, the defendant’s speedy trial right is purely statutory with no constitutional dimension. (Cf., CPL 30.20.) Yet this court need not decide which standard is to be applied when a statutory right is involved.
In short, the court finds complainant’s hearing testimony to be incredible in the many material respects discussed above and below. The People have failed to meet their burden even by a preponderance of the evidence. The court finds that the complainant’s absence from participating in this prosecution was not due to defendant’s misconduct as alleged.
DUE DILIGENCE
The People maintain that even if the defendant did not cause the 182-day delay between December 10, 1997 and June 10, 1998,[10] dismissal of the indictment is nonetheless unwarranted.
The People first argue that once a statement of readiness was filed and served on the court and defendant respectively, they should only be charged with any delay that is caused by the People.[11] (People v Anderson, 66 NY2d 529.) Secondly, the People contend that they used due diligence to secure the complainant’s attendance and the time period at issue is thus excludable. (CPL 30.30 [4] [g].)
The complainant testified that she moved from her residence at 90 Schenck Avenue in Brooklyn shortly after she testified *136 before the Grand Jury on May 1, 1997. She did, however, inform the officers of the 75th Precinct of her new address. Even though she did not inform the District Attorney’s Office that she had left her former residence and to where she had moved, she did list her mother’s residence as 40-19 99th Street, Queens, New York, both in her CJA arrest interview sheet on April 14, 1997 as well as in her testimony before the Grand Jury on May 1, 1997. Moreover, defendant’s written and signed statement given to the police and enclosed as part of the voluntary disclosure form provides the address for the complainant’s mother. The complainant had returned to her mother’s house in late October or early November 1997.
On January 9, 1998, detective investigators from the District Attorney’s Office went to 90 Schenck Avenue to locate the complainant. One resident told the investigators that no one fitting complainant’s description resided there. On February 11, 1998, the investigators located the complainant at her mother’s house in Queens.[12] The complainant indicated that she would cooperate. She said that she would call the assigned Assistant District Attorney. Subsequently in February 1998 she spoke with the assigned Assistant but never came in as she promised.[13] The other two occasions in July 1998 that the investigators sought to bring in the complainant are not really pertinent to a resolution of the due diligence issue as these contacts postdate the speedy trial motion.
The unavailability of a witness may be an exceptional circumstance justifying a delay providing the People attempt with “due diligence” to make the witness available. (People v Zirpola, 57 NY2d 706.) Due diligence must be employed both in the prereadiness (People v Figaro, 245 AD2d 300) and post-readiness contexts. (People v Robbins, 223 AD2d 735, lv denied 88 NY2d 941; People v Carpenito, 199 AD2d 522.) It is the People’s burden to show due diligence to make the witness available. (People v Berkowitz, 50 NY2d 333, 349.)
To demonstrate due diligence “the People must undertake ‘credible, vigorous activity’ to make the witness available”. (People v Figaro, 245 AD2d 300, supra, citing People v Washington, 43 NY2d 772, 774.)
*137 The People have been held to have met their burden of demonstrating “credible, vigorous activity” by diligently attempting on numerous occasions, albeit unsuccessfully, to procure a key witness (People v Carpenito, 199 AD2d 522, supra) or by taking definitive steps to secure the attendance of a reluctant witness. (People v Khan, 146 AD2d 806 [upon learning that the witness was reluctant to testify and living in Florida, the People immediately prepared a material witness order, had it signed and forwarded it to the Florida State Attorney’s Office].)
The People have been held to have failed to meet this burden when a detective made a few phone calls and one visit to complainant’s home in a two-month period (People v Figaro, 245 AD2d 300, supra) or when law enforcement officials contacted recalcitrant witnesses from time to time in a six-month period (People v Meyers, 114 AD2d 861). In these instances, the People failed to show that they attempted with diligence to make the witnesses available. (People v Robbins, 223 AD2d 735, supra.)
Here the People did not exert the type of “credible, vigorous activity’ required by the case law in defining the term “due diligence”. Although the complainant moved from her house, she did go to her mother’s house from time to time from May to late October 1997. The police officers from the 75th Precinct (the precinct where the defendant’s arrest was processed) were aware of the complainant’s new address. When the more serious charges were dismissed, with leave to re-present to another Grand Jury on November 5, 1997, the complainant had in fact resumed living with her mother. The People had access to this address by way of complainant’s Grand Jury testimony, her CJA interview report dated April 14, 1997 and defendant’s signed and written statement given to the police on April 14, 1997.
Sending detective investigators out on two occasions in a four-month period does not pass the standard of “credible, vigorous activity’ articulated by the appellate courts (see, People v Figaro, 245 AD2d 300, supra; People v Robbins, 223 AD2d 735, supra; People v Meyers, 114 AD2d 861, supra).
The complainant, despite her February 1998 promise to come into the prosecutor’s office, failed to do so. No further effort, by way of material witness order or otherwise, was made to secure her attendance between February 1998 and June 8, 1998, the date of the filing of the motion. (See, People v Khan, 146 AD2d 806, supra; People v Warren, 85 AD2d 747.) The subsequent efforts in July 1998 were made to fashion a response to defendant’s motion to dismiss.
*138 The defendant has not forfeited his right to make a statutory speedy trial claim. The complainant is deemed incredible in many material respects. Due diligence has not been demonstrated by the People. It is noted that complainant appears to have avoided cooperating with the People for her own reasons unrelated to any conduct by the defendant. Accordingly, the motion to dismiss the indictment pursuant to CPL 30.30 is granted.

. There are 183 days in the six-month period from April 10, 1997 to October 10, 1997 for counts one through seven (docket 97K030616) and for the six-month period from April 26, 1997 to October 26, 1997 for counts eight through eleven (docket 97K033326).

. An indictment may contain various criminal actions each one having a different commencement date for statutory speedy trial purposes (People v Velie, 193 AD2d 1107, 1108; People v Lashway, 187 AD2d 747, 748; People v Murray, 127 AD2d 704, 705; People v Papa, 96 AD2d 601, 602-603).

. Two counts each of rape in the first degree and sexual abuse in the first degree were dismissed.

. Complainant’s testimony before the Grand Jury indicates that she was unconscious. Complainant, however, apparently did not tell the arresting officers or hospital personnel that she lost consciousness. The felony complaint executed by Police Officer James Biot of the 75th Precinct does not indicate that the forcible compulsion was by means of complainant’s inability to consent, i.e., loss of consciousness. The police reports similarly contain no notation that complainant was unconscious.

. The New York City Criminal Justice Interview Report lists complainant’s prior address for a 20-year period as her mother’s address — 40-19 99th Street, Queens, New York. This information was clearly provided by complainant during her arrest interview by CJA on or about April 14, 1997.

. Complainant states that she may have received one or two letters prior to January 1998.

. This letter is the only one which is arguably a tampering crime. (See, Penal Law § 215.10.) It is clear that the complainant did not in fact receive this letter until months after the court dates listed in the letter. Thus, it accounted for none of the delay herein.

. Defendant testified that complainant brought him property on several occasions, namely, a bathrobe, tee shirts and socks.

. In conclusory fashion, complainant did indicate that she did feel intimidated.

. The People do not claim that time in this 182-day period should be excludable on other grounds.

. Even under the People’s argument, the two counts of rape in the first degree and two counts of sexual abuse in the first degree that were dismissed after the court’s inspection of the Grand Jury minutes on November 5, 1997 would be subject to prereadiness analysis.

. The investigators’ reports were placed in evidence. A stipulation was entered into between the People and the defendant’s attorney that, had the investigators been called as witnesses, their efforts would consist of what was contained in the reports.

. Complainant testified that she left her mother’s house for about three weeks in February 1998, but then returned.