(160 App. Div. 651)
### PEOPLE v. CASSIDY.

(Supreme Court, Appellate Division, Second Department.  February 20, 1914.)

1. CRIMINAL LAW (§ 566*)—EVIDENCE OF IDENTITY—WEIGHT.
    The probative force of a witness' identification of accused must be determined by the witness' reliability based on his familiarity with the person in controversy and his freedom from prejudice.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1273–1275; Dec. Dig. § 566.*]

2. CRIMINAL LAW (§ 566*)—IDENTITY—EVIDENCE.
    In a prosecution for robbery in the first degree and grand larceny in the second degree, evidence held insufficient to identify accused as the person who committed the offense.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1273–1275; Dec. Dig. § 566.*]

Appeal from Kings County Court.

James Cassidy was convicted of robbery in the first degree as a second offense and grand larceny in the second degree as a second offense, and he appeals.  Reversed, and new trial ordered.

Argued before JENKS, P. J., and BURR, THOMAS, RICH, and PUTNAM, JJ.

John J. Curtin, of New York City, for appellant.

Edward A. Freshman, Asst. Dist. Atty., of Brooklyn (James C. Cropsey, Dist. Atty., of Brooklyn, on the brief), for the People.

JENKS, P. J.  This appeal turns almost entirely upon the credibility of a single witness, who identifies the defendant as the criminal, for there is no other evidence, direct or circumstantial, that connects the defendant with the crime.

Upon the issue of identification the burden of proof rested upon the prosecution (Wharton's Crim. Evidence [10th Ed.] § 329), and the defendant was entitled to the benefit of any reasonable doubt (Greenleaf on Evidence [15th Ed.] vol. 3, § 30; State v. Morris, 47 Conn. 179).  A writer on evidence well says that evidence of identity is "perhaps one of the most difficult questions·with which courts and juries are called upon to deal," and again:

"Evidence of identity should be as far certain as human recollection under the most favorable circumstances will permit.  The books are full of instances where inaccurate evidence as to identity has consigned unfortunate beings to the prison and the gibbet."  Rice on Evidence, vol. 3, §§ 300, 304.

For many instances, see Ram on Facts, Will on Circumstantial Evidence, Wigmore's Principles of Judicial Proof.

As the defendant did not attempt to impeach the witness, our inquiry is limited to his capacity.  Under the disadvantage of not having seen or having heard the witness, unlike the triers of fact, but with the advantage, denied to them, of isolated time for deliberation upon a permanent record, we must strive to determine whether the probative force of this testimony was sufficient to justify the verdict.

[1] That probative force must be determined by the reliability of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

this witness. Mr. Wharton says in his Criminal Evidence (10th Ed.) § 807, that the two great constituents of reliability are "familiarity with the person in controversy, and freedom from personal or party prejudice." But after we have determined such familiarity and passed upon such freedom, we must estimate the capacity of the witness for perception, observation, reflection, memory, and reasoning, as revealed by him upon the witness stand. And we must endeavor to estimate some other characteristics of the man as exhibited in his testimony.

[2] About 7:30 p. m. of February 15, 1912, Price was in the rear room of his jewelry shop in Broadway in the borough of Brooklyn, about to eat his supper. Scharen, an optician, who worked there, was alone in the shop. Two men came through the door of the shop, confronted Scharen with pistols drawn, and ordered him into that rear room. After some parley, Scharen obeyed. Price, who had come to the door of the rear room, was also ordered to stay in that room and obeyed. One of the men held Scharen and Price at bay in that room at pistol's point, while the other gathered up some of the wares. Scharen, when he did not obey promptly a command to raise up his hands, was struck and wounded by the man who was holding him at bay. The man who was rifling the shop went out, his companion backed out after him, and both escaped with their plunder. At the trial, Scharen, the witness now under discussion, positively identified the defendant as the man who kept guard over him and Price. Scharen, during the time that intervened the crime and the trial, testifies that he saw the defendant once at police headquarters, twice at a magistrate's court. He testifies that he identified the defendant on the first visit to the magistrate's court and that he recognized him on the second visit. He does not describe any peculiarity of appearance or of manner that then impressed him. He did give a description of the men to the police, but it does not appear that it corresponded with the defendant in any marked degree.

He admitted that on February 25th he and Price went to police headquarters in the borough of Brooklyn at about 7:30 p. m., that there was then lined up before them a number of men, of which the defendant was one, and that he (Scharen) was asked to identify the criminal. He testifies that he could not do so, although he admits that he was neither nervous nor hurried and that he had full opportunity for careful and repeated scrutiny. His explanation of his failure is that he was "kind of shaky" and "kind of in doubt." Lynch and O'Connell, connected respectively with the New York Tribune and the New York Times newspapers, testified that they stood in the line at the time, and that not only Scharen failed to identify the defendant, but that, after long and careful scrutiny, he identified, or went far to identify, Lynch, who was next in line to the defendant, as the criminal. Lynch is positive, save that the hand of Scharen extended towards him did not rest upon him; but O'Connell is positive that Scharen actually laid his hand upon Lynch. Before these witnesses testified, Scharen had denied that he had identified any one on this occasion; but the testimony of these two witnesses was not thereafter contradicted, although not

difficult if contradiction were possible, for there were several other people, including a high police official, then present at the headquarters. It is true that O'Connell on cross-examination admitted that there were other "line-ups" that night that included him and Lynch, but he was positive that on no other occasion was Lynch identified as a criminal. And there is evidence of another attempt at identification by Scharen at the Raymond Street jail on the occasion of lining up a number of people in the latter part of that February, which resulted in failure. Scharen himself, although he testified that he knew the location of that jail, testified five times that he did not remember that he was ever there, and that he was positive that he had never attempted and yet had failed to identify the defendant in that jail. But Kiebrick, a keeper of the jail, and Clarke, then a prison keeper of the jail and now a keeper in another prison, who was apparently indifferent to all parties, testified positively that there was such line-up, and Clarke testified that Scharen and Price then made an attempt at identification and failed. It is true that there was no record of such a line-up as is usual in such cases.

After the crime, Scharen failed to identify the criminal with photographs produced by the police, supposed to be likenesses of the defendant. He was in frequent conversation with members of the police force almost every day. He says:

"I didn't talk to any policeman about the case at all, until they come to the store and asked us about it. Then we said, 'Well, we didn't know.'"

He was told by them that they had in custody in the magistrate's court two men as the suspected criminals, and that he was wanted to identify them. He admits that when he first saw the defendant in that place the defendant was alone in one of the cells, in not very brilliant light and in the daytime, that he approached the cell with detectives, and that he then knew that the detectives wished him to identify the man therein as the criminal. And he testifies he recognized the defendant right there and then. He afterwards saw the defendant in the police court and had full occasion to study him.

It does not appear that Scharen or Price had ever seen the defendant or his companion before the period of the crime. The time afforded for original observation of the criminals, according to Scharen, was about 8 or 10 minutes. He stood behind the counter reading a newspaper. The two men unlatched the front door, ran in, and immediately both confronted Scharen with pistols drawn. Scharen had been facing the wall and did not look at the door. As he and the men faced one another, the ordinary large gaslight in the shop, overhead, shone downwards, and if, according to Scharen, the defendant wore a peaked cap, that headgear shadowed defendant's face. Scharen says that the part of the occurrence in the shop consumed about two minutes, but of course any estimate of time by minutes is mere guesswork, and as the instant orders given to Scharen were to go into the rear room, the interval between such command and obedience must have been very brief, although Scharen did parley with the men in a sentence or two. For the remainder of the time both Scharen and

Price were held in the rear room. Scharen says that the light in this room was very dim, partly dark, did not amount to anything, and Price, who had come from the room, says that it was not lighted at all, that there was "just enough light to see around the stove." Some light did penetrate from the shop, but that shone over the safe. It was in this room only that Scharen saw the one criminal alone. And the evidence justifies the inference that the criminal stood with his back towards the reflected light from the shop, as he must have faced the men whom he held at bay, and it is clear enough that these two men had a view into the shop.

It is not violent assumption that the opportunity for Scharen's impression as to the identity of the person of this criminal was afforded only in the brief interval between the time he was confronted by the two men in the shop and the time he obeyed the command to go into the rear room, and this is the period in which Scharen says that he saw the face distinctly. During that tense period, a man in Scharen's position would naturally be greatly excited. A few days afterwards he attempted identification under circumstances which afforded him every opportunity for long and careful scrutiny, and confessedly failed. And according to the other credible testimony, he not only failed but he mistook another for the criminal. Moreover, there is testimony that he failed once again under similar circumstances. Then followed again his failure as to the photographs, and then the identification in the magistrate's court. Before this identification he had been in more or less constant touch with the police, and he went to the police court at the request of policemen and detectives, understanding from them that they wished him to identify a certain person then under arrest. In company with detectives, he went to the cell where that particular person was in solitary confinement and thereupon identified him at once. We do not say that in this instance there was coercion, but it is clear that suggestion from the officers of the law was made that he should do exactly what he did. He was in effect told to go down to the police court cell to identify as the criminal a certain person then in a cell, who was first pointed out to him by the police as a suspect. We impute no blame to the police, for it was their duty to see that the man under arrest was identified if that was possible.

The circumstances of Scharen's failure at headquarters, and of his success at the door of the cell, were radically different. He had every advantage at the former place that he possessed at the latter place. But on the first occasion he was required to select the defendant from among other men, and on the second occasion he was first pointed to the person to be identified. Naturally on the first occasion his impressions of the criminal were more recent. Nothing is shown to have occurred between the visits to the headquarters and to the police court that helped the witness to certainty. But his original doubt (to express description of his state of mind) was dissipated without any apparent reason, and his final certainty, for aught that appears, must have been the result of reflection alone upon the same circumstances which were not sufficient for his identification at police headquarters, or even to save him from positive mistake at that time. Contrary to the natural

order of things, the witness asserts under cross-examination that his impression was "more fresher" as time sped on, and that it was "getting fresher every day." His study of the defendant in the police court, he says, confirmed his opinion. But on the second occasion in the police court he saw the defendant as a prisoner at the bar, accused of a crime. The learned and able assistant district attorney lays stress upon the fact, as testified to by Scharen, that when he saw the defendant and his alleged companion, Redmond, together, he became positive for the first time, and suggests as a reason that the appearance of two related matters brings more readily to memory the subject upon which there was uncertainty or lapse of memory. It is true that the association with a person recalled dimly, of some incident or circumstance which we remember, often enables us to recall clearly the person himself. .But what was there in the association of Redmond with the defendant in the crime that to Scharen cast light upon the identity of the defendant? Redmond, too, was a stranger to the witness. Redmond with his companion at first confronted Scharen when the latter stood behind the counter, but after that moment, according to Scharen and Price, Redmond returned from the rear room, went about rifling the shop, and remained there until his escape. Scharen does not tell us why the sight of Redmond in company with the defendant, or how the subsequent association of the two men, resolved his doubts.

Price invariably failed in his attempts before and at the trial to identify the defendant. The difference in the opportunities of Scharen and Price is found in the circumstance that Price came out of the rear room and stood at the door to see the men confronting Scharen, and that his mind was diverted by his young lad who was with him in the rear room for awhile, while he was held there, and by his testimony that he closed his eyes while the pistol was pointed at his head. But he had from his point of view a similar opportunity to see the men who confronted Scharen while Scharen saw them, and before Scharen and he went into that rear room.

We do not perceive any spirit of malice or of persecution in the witness. It was natural, like any other good citizen, that he would desire to see the criminals detected and punished. It was not unnatural that as the victim of a wanton assault he should desire to see his assailant revealed and punished. And as a witness it was natural that he would wish his testimony, positive in its character, to be approved, accepted, and appreciated.

The learned assistant district attorney, who did not take part in the trial, is frank to state in his brief that Scharen was "a man of small affairs, who was obviously confused by sharp cross-examination, and easily mixed by questions requiring a ready and acute memory." We do not disagree with this estimate. Indeed we commend, as we have had frequent occasion heretofore to commend, this public prosecutor for his fairness and his frankness. Scharen's powers of memory do not impress us. He testified that he was 59 years old and that he had been an optician for 47 years. Naturally a man remembers the different periods of his business life. And although it appears that he had no reason for concealment, he exhibited lapses of memory in such

matters. Thus he testifies that he left employment with a firm after 10 years' service in about 1901, and then under further cross-examination that he left the firm in 1889. And he was unable to account for nearly 15 years of the period of his business life, save with the explanation that he was at home—but kept no store. He could not identify in court the policeman who had taken charge of the case on the night of the crime, when that policeman stood up before him in court, nor could he recall the detective under similar conditions. He was certain that the defendant wore an overcoat at the time of the attempt at identification at headquarters, and he laid stress on that fact in contrast to the defendant's garments when he was in the cell at the police court, and yet Lynch and O'Connell testify positively that they removed their coats at the request of the defendant when they went into the line-up, in order that apparel would be uniform. He could not recall any visit to the jail, although he was positive that he did not attempt identification, and yet we have the testimony of the keepers to the contrary. He was questioned minutely as to his presence in part 5 of the Supreme Court in November, 1912, and, although he was plied with questions involving the details, he made his denial emphatic by saying that he was not there unless in his sleep. A night intervened and then, taken in hand by the learned trial counsel for the people, he said he had been refreshing his memory after conversation with counsel, and so he "come to remember" he was subpœnaed, and that he was told that it was not this case but another case on trial and might go home. On recross he was asked:

"You know when I asked you yesterday, I asked you to be very careful and take your time before answering, remember that? A. I do.

"Q. You remember that your answer was that if you were in part 5 you must have been asleep when you were there? A. I did not say anything of the kind. * * *

"Q. And you remember my asking you for at least ten minutes about your being in part 5, and swearing positively you never were there until last month? A. I only come to remember that I was subpœnaed, that's all I remember. Afterwards I come to refresh my memory."

This is rather a startling lapse in relation to matters almost germane to the case at bar. For example, he was asked on cross-examination:

"Q. So that you did not see these two men running away up the street, did you? A. No.

"Q. And you didn't swear that they did run up the street? A. Well—

"Q. Did you swear?

"Mr. Caldwell: I don't think he did.

"A. I didn't swear I ran after them. I did not see them run.

"Q. Didn't you swear here this morning that they went out to the street and ran up the street? A. They ran up the street, yes.

"Q. You swear you saw them run up the street? A. No.

"Q. You swore they did run up? A. Well, I didn't see them run."

Again he was asked on cross-examination:

"Q. Were you not down to the jail? A. No.

"Q. Didn't you go to the county jail on Raymond street at all? A. No, sir.

"Q. At no time? A. No time.

"Q. Didn't you testify in answer to a question by Mr. Caldwell that you did go to the jail? A. No, sir; it was the Flatbush jail, I seen him in the court."

And further on he testified:

"Q. Were you ever in the Raymond street jail? A. Who? Me?

"Q. I am not talking with anybody else at the present time. A. I don't remember that.

"Q. Is that your best answer, that you don't remember whether you were in the Raymond street jail or not? A. I don't remember.

"Q. And can't you state to this court and jury whether or not you were ever in your life in Raymond street jail. A. I don't remember it.

"Q. You know where the Raymond street jail is? A. I do.

"Q. Were you ever inside its doors? A. Not as I remember.

"Q. Think. A. I told you I don't remember.

"Q. Will you swear positively that you were not there? A. I don't know.

"Q. Isn't it a fact you went down to the Raymond street jail and attempted to identify this man Cassidy? A. No."

Many other similar examples might be given. It appears also that he had suffered from "presbyopia" for 15 years, and that he had fitted himself to eyeglasses which he required in reading but that were not used for long vision. He used them for reading the newspaper on the evening of the crime, but took them away when he looked at the criminals, whom he says he could see distinctly. As to the manner of the witness, we note that the court said to him:

"I have spoken several times about repeating the questions of counsel. It is incumbering the record and consuming time. If it is necessary for you to think before making a reply, think without repeating the question."

Such habit may, as we well know, be indicative of slow mental process, or of the desire to be exactly accurate in the answers, or of reservation of the whole truth, or of falseness of deliverance. We repeat that we do not say that the witness was willfully false in his identification. On the contrary, we assume that he intended to be truthful in his identification. But he does not impress us as one scrupulous to cling to an original doubt, but rather as ready to disregard it in order to strengthen his statements, as inclined to be positive rather than accurate, as apt to leap to certainty rather than to count his steps, as susceptible to suggestion, and, when assured by others of a fact, ready to affirm that it exists, casting aside dubiety. His positivity is not of strength but of weakness.

There was, as we have said, no other evidence even of identifying circumstance which connected the defendant with the crime. The defendant took the stand in absolute denial and to assert that at the time of the crime he was in the house where his family lived. To support the latter assertion, he called his mother as a witness, who testified likewise, and who determined the date by reference to a trifling incident. The alibi, of course, was rejected, in that the jury found the guilt of the defendant. But that incidental rejection does not necessarily imply that the jury thought that the woman deliberately lied, for the jury may have determined that the evidence was not satisfactory as to the essential elements of day and hour. Barrett, J., for the court in People v. Smith, 55 Hun, 606, 7 N. Y. Supp. 841, a case that is similar to the one at bar, well said:

"The defendant * * * cannot be convicted because of the mere weakness of this defense. The question of identification still remains, and must be determined upon the case made by the prosecution, supplemented by any

testimony emanating from the defendant really indicating a consciousness of guilt."

It is true that the defendant had a criminal record, and that he was not revealed as an orderly or industrious person; but, although such proof makes against him, it of course is not sufficient to convict him of this crime, and it throws no direct light upon the reliability of the evidence of identification.

The defendant was jointly indicted with Redmond, but was tried separately. At this trial Scharen also identified Redmond as one of the criminals. Thereupon there was a great mass of testimony taken to establish that Redmond was elsewhere at the hour of the crime, and the trial drifted into a partial trial of the alibi. But such proof only went to the credibility of Scharen. And the jury did not necessarily determine that the alibi was false, for the jury dealt only with the identification of the defendant. All that can be said is that, despite the proof that was given to show that Scharen's identification of Redmond was error, the jury found that Scharen's identification of the defendant was sufficient. We are not called upon to pass upon the probative force of the proof of identification as to Redmond. Suffice it to say that there was nothing elicited in this feature of the case that identified the defendant with the criminal.

Upon full consideration of the case we are convinced that it would not be safe to affirm this conviction, that rests almost, if not altogether, upon this testimony of personal identification. Greenleaf on Evidence (15th Ed.) vol. 3, § 30, says:

"But it must not be forgotten that the books furnish deplorable cases of the conviction of innocent persons from the want of sufficiently certain proofs either of the corpus delicti or of the identity of the prisoner. It is obvious that on this point no precise rule can be laid down, except that the evidence 'ought to be strong and cogent,' and that innocence should be presumed until the case is proved against the prisoner, in all its material circumstances, beyond any reasonable doubt."

The judgment of conviction of the County Court of Kings County is reversed, and a new trial is ordered. All concur.