[764 NYS2d 434]

In the Matter of DUANE F., a Person Alleged to be a Juvenile Delinquent, Appellant.

First Department, September 30, 2003

## APPEARANCES OF COUNSEL

*Marcia Egger* of counsel (*Arlene Libowitz* on the brief; *Monica Drinane, The Legal Aid Society, Juvenile Rights Division,* attorney), for appellant.

*Grace Goodman* of counsel (*Larry A. Sonnenshein* on the brief; *Michael A. Cardozo, Corporation Counsel* of New York City, attorney), for Presentment Agency.

### OPINION OF THE COURT

MARLOW, J.

This is a single eyewitness identification case. The complainant, also the eyewitness, did not testify at the *Sirois*,[1] *Wade* or fact-finding hearings. The only evidence admitted at the fact-finding hearing about the identification procedure was the transcript of the prior hearsay testimony of a police officer, who had determined, without a legally adequate foundation, that the complaining witness and Duane F. (hereinafter appellant) were known to each other. He therefore conducted a "confirmatory" station house showup, a procedure that is not justified on this record.

As for the *Sirois* hearing, in addition to the complainant's supporting deposition attached to the petition, the only witnesses who testified were Assistant Corporation Counsel (ACC) Lisa Cronk, City Law Department Investigator Latisha Bowry and Sgt. Kevin O'Connor. They described to the court the complainant's claims of intimidation, and ACC Cronk gave the court a verbal account of the complainant's version of the criminal act forming the basis of the Family Court proceeding.

The fact-finding hearing evidence consisted of the hearsay testimony of ACC Cronk—the only live agency witness—the *Wade* hearing testimony of Officer Bonilla, and the complainant's supporting deposition.

Appellant now challenges certain rulings of the Family Court at all three hearings. Specifically, he claims that the presentment agency failed to establish that the identification procedure was merely confirmatory. Consequently, he claims the ensuing showup was impermissibly suggestive. He further argues that the presentment agency did not meet its burden of proving at the *Sirois* hearing (1) that the complaining witness was unavailable to testify or (2) that the evidence of guilt that would be offered at the fact-finding hearing as a substitute for her live testimony was reliable. Finally, he maintains that the Family Court erred in admitting the police officer's *Wade* testimony as a substitute for his in-person testimony at the

---

1. The procedure recommended by the Court in *Matter of Holtzman v Hellenbrand* (92 AD2d 405 [1983]) is known as a *Sirois* hearing, named after the defendant in the underlying criminal proceeding.

subsequent fact-finding hearing, and that the evidence of guilt was otherwise legally insufficient. Because we agree that the Family Court committed errors regarding all three hearings, we conclude that this appellant was deprived of a fair fact-finding hearing, and we reverse.

## THE PETITION AND APPLICATION FOR A *SIROIS* HEARING

The presentment agency issued a subpoena directing the complainant to appear at its offices on December 27, 2001. Although the agency served it on the complainant's grandmother, the complainant nevertheless appeared and provided a sworn statement about the incident to Assistant Corporation Counsel Lisa Cronk. On January 4, 2002, the presentment agency commenced a juvenile delinquency proceeding pursuant to article 3 of the Family Court Act. The petition alleged that on December 11, 2001, the 15-year-old appellant, accompanied by two adults—Duane Davis (Davis) and Christopher Follett (Follett)—intentionally placed the complainant in reasonable fear of physical injury, serious physical injury, or death by pointing a gun at her and her boyfriend (Junior) and waving it up and down. The petition was corroborated by the complainant's sworn statement. It further asserted that appellant had committed acts which, if committed by an adult, would constitute the crimes of menacing in the second and third degrees.

Although the presentment agency did not request the complainant's presence at the initial court appearance on January 4, 2002, she nevertheless appeared, apparently at the insistence of Lenita F., appellant's cousin. At that appearance, the law guardian revealed that the complainant's boyfriend, Junior, had previously been involved with Lenita. However, although appellant and his cousin Lenita lived in the same apartment, the law guardian did not know whether the juvenile himself had ever met the complainant or her boyfriend Junior.

The presentment agency served the complainant with a subpoena on January 8 to testify at the fact-finding hearing scheduled for the next day. On January 9, the complainant and her parents appeared at ACC Cronk's office and indicated that she would not testify because appellant and certain members of his family had made threats against her. The presentment agency made an oral application before the Family Court for a *Sirois* hearing, but the court directed that the agency make the request in writing. The next day, the presentment agency formally moved for an order allowing the complainant's "prior out of court statements" to be received into evidence as a result

of appellant's misconduct. The petition did not specify which prior statements of the complainant would be offered. The only sworn statement supporting the *Sirois* application was Cronk's affirmation. The Family Court ruled that the presentment agency had alleged specific facts which demonstrated the "distinct possibility" of witness tampering and granted the motion for a *Sirois* hearing.

## THE *SIROIS* HEARING

The assistant corporation counsel testified at the *Sirois* hearing about several specific incidents of intimidation involving phone calls from and menacing acts by appellant's relatives, threats by the appellant's accomplices, Follett and Davis, and separate intentional acts of property damage to her car. The substance and existence of these threats and acts were never seriously challenged.

Because the complainant was reluctant to testify, Cronk obtained a so-ordered subpoena for her to appear at the fact-finding hearing.

New York City Law Department Investigator Latisha Bowry testified at the *Sirois* hearing that on January 8, 2002, she served the complainant with the subpoena. The complainant told Bowry she was "really afraid" to come to court and showed her the damage to her car. Bowry responded that the subpoena required her attendance. Nonetheless, the complainant telephoned Cronk that day to say she would not testify. Cronk reiterated that the subpoena obligated her to appear and that she should at least appear to describe the intimidation. Sgt. O'Connor then telephoned and reiterated that the subpoena required her to attend and that the police could help her if she personally spoke to them. He also spoke to the complainant's father, who "did not seem to have an objection," and he agreed to accompany the complainant to court the next day.

On January 9, 2002, the day the fact-finding was scheduled, the complainant did arrive at Cronk's office with her mother, father and a family friend. She stated she would not testify. Instead of proceeding with the factfinding, the presentment agency made an oral application for a *Sirois* hearing.

The presentment agency never called the complaining witness to testify at the *Sirois* hearing. Nor did the court question the complaining witness in camera. Moreover, there were no prior sworn statements of the complainant introduced into evidence at the *Sirois* hearing. Nor did the presentment agency call Police Officer Bonilla to describe his interview with the complainant.

The Family Court found that "the complaining witness is un-available because of the direct and indirect misconduct of [ap-pellant], and his family, and therefore [appellant's] right to confront the witness at [the fact-finding hearing] has been forfeited." The court did not identify which hearsay statements, in particular, would be admitted into evidence at the fact-finding hearing.

### THE *WADE* HEARING

The law guardian moved to suppress the complainant's station house showup identification. Counsel observed that the presentment agency was proceeding on the theory that the complainant and appellant were previously known to each other and therefore the station house showup identification was merely confirmatory. However, counsel argued that the mere assertion of prior knowledge did not establish that the identification procedure was merely confirmatory in light of the appellant's denial of a prior acquaintance with complainant. The court ordered a *Wade* hearing instead of a *Rodriguez* hearing, with the issue of independent source to be addressed only if suggestibility were established.

Over the law guardian's strenuous objection, the court also ruled that if the identification were not suppressed, the *Wade* hearing testimony would "come[ ] into the record as evidence in chief" at the factfinding given that the complainant was un-available and the fact-finding hearing was before the bench.

At the *Wade* hearing, Police Officer Brian Bonilla testified that he and his partner responded to a 911 call of "a man armed with a gun" at 140 Alcott Place. When he reached the address, he saw the complainant's boyfriend Junior, but not the complainant. Junior said he knew the person who pulled the gun was "Duane" in 16C and took the officers to the apartment.

The officers knocked and asked Duane and another young in-dividual to step into the hallway, where Junior identified ap-pellant Duane F. as the person who had the gun. The police ar-rested appellant and, at the precinct, placed him in the juvenile room while Officer Bonilla left to do paperwork.

After Junior went back to the precinct with the officers, he asked to go out to smoke a cigarette. He never came back. Offi-cer Bonilla went upstairs to the squad room to look for Junior and there found the complainant seated. He did not know how she got there. He asked who she was and what happened. She replied: "A guy named Duane that my friend Junior knows

who pointed a gun at us, and I was there at the scene." However, on cross-examination Officer Bonilla stated that the complainant told him "that her [*sic*] and Junior, which is her boyfriend, knew a guy name[d] Duane and he pointed a gun at them." According to Bonilla, complainant also said that she knew Duane and that he lived at 140 Alcott, apartment 16C. The officer acknowledged that there were two people named Duane arrested that day and that both lived at 140 Alcott Place, albeit in different apartments.

Officer Bonilla took the complainant downstairs to the juvenile room, telling her he wanted to make "100 percent" sure that he had the right person. Appellant was in the room, unhandcuffed, with only one other person, a police officer. Officer Bonilla had appellant walk towards the doorway so the complainant could see him. The complainant nodded, saying "Yes, that's him." When asked if she was sure, the complainant confirmed he was the individual who menaced her. Officer Bonilla identified appellant at the hearing as the person complainant identified.

Bonilla did not believe a lineup, which would have been arranged by detectives, was necessary because he believed the complainant and appellant knew each other. However, on cross-examination, Bonilla admitted that even though the complainant stated she only told him she knew appellant through her boyfriend, he never asked her how long she knew appellant, how many times she had seen him in the last couple of months, when she last saw him before this incident, or how long her boyfriend Junior knew appellant. Nor did he take her to identify the other Duane in custody who lived in a different apartment at 140 Alcott.

Officer Bonilla prepared a complaint report. The complainant told him that she had been at 140 Alcott, went upstairs and downstairs, and that the person with the gun was "Duane." While the final typed copy of the complaint indicated that the complainant "cannot identify person involved in the incident," Officer Bonilla maintained that statement was a mistake and that his scratch copy indicated the complainant was able to identify the suspect, but that he was not her friend.

Noting that (1) the police had probable cause for appellant's arrest based on Junior's original identification, (2) the complainant was not at the precinct at the behest of the police, (3) Officer Bonilla came upon her accidentally, (4) no information had been given to her regarding appellant other than being asked to view him after she explained she was a victim,

and (5) the complainant identified him by his first name and apartment number, the court found that the identification was "confirmatory" and therefore no basis existed to suppress the showup identification.

## FACT-FINDING HEARING

Counsel again objected to admitting Officer Bonilla's testimony at the fact-finding hearing. However, the court deemed the officer's hearing testimony part of the fact-finding hearing and he was not called to testify in person. Counsel also reiterated appellant's continuing objection to the admission of ACC Cronk's hearsay testimony as a substitute for that of the complainant.

The complainant's sworn affidavit, submitted in support of the presentment agency's petition, was admitted into evidence at the fact-finding hearing. It set forth the factual predicate for the menacing charges. ACC Cronk testified at the fact-finding hearing. She described the alleged incident as the complainant related it. ACC Cronk offered no testimony as to how and when the complainant identified appellant as the person who had committed these acts. The only other evidence considered by the fact-finding court on behalf of the presentment agency was Officer Bonilla's prior hearing testimony.

The fact-finding court found the presentment agency met its burden of proof and ruled that appellant had committed acts which, if committed by an adult, would constitute the crimes of menacing in the second degree and menacing in the third degree. The Family Court ordered that appellant be placed with the Office of Children and Family Services for a period of 12 months.

## ANALYSIS

We begin our analysis with the firmly rooted notion that " '[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other factor—perhaps it is responsible for more such errors than all other factors combined' " (*People v Riley,* 70 NY2d 523, 530 [1987] [citation omitted]; *accord People v Dixon*, 85 NY2d 218, 224 [1995]; *see also People v Daniels*, 88 AD2d 392, 399 [1982] ["(b)ecause of its persuasive power and inherent unreliability, eyewitness identification is always fraught with peril"]; *People v Cassidy*, 160 App Div 651, 652 [1914], quoting 3 Rice, Evidence §§ 300, 304 [" 'books are full of instances where inaccurate evidence as to identity has consigned unfortunate

beings to the prison and the gibbet' "]). Thus, "[e]fforts to control or, at least, to somehow reduce the built-in potential for error in eyewitness cases have long been the concern of the best minds of both Bench and Bar" (*People v Daniels*, 88 AD2d at 401).[2]

We are especially concerned here as this appeal turns entirely on the truth of untested out-of-court statements of a single eyewitness who identified appellant as the perpetrator, since no other evidence, direct or circumstantial, connects this juvenile with this crime. Indeed, appellant's initial accuser fled from the police never to be heard from again. And, there is no indication that the presentment agency made diligent efforts to locate him. Moreover, we are further concerned because there is not one shred of nonhearsay testimony which has been subjected to cross-examination establishing any of the usual circumstances a factfinder normally considers in assessing the reliability of a witness's identification of a suspect. Furthermore, the record is totally devoid of a factual foundation to support the officer's decision to deem this to be a confirmatory viewing and therefore to conduct a station house showup.

*I. Sirois Hearing*

■ The admissibility of prior testimony of a witness is limited to three specific areas. Criminal Procedure Law § 670.10 (1) states in relevant part that:

> "testimony given by a witness at (a) a trial of an accusatory instrument, or (b) a hearing upon a felony complaint conducted pursuant to section 180.60, or (c) an examination of such witness conditionally, * * * may, where otherwise admissible, be received into evidence at a subsequent proceeding in or relating to the action involved when at the time of such subsequent proceeding the witness is unable to attend the same by reason of death, illness or incapacity, or cannot with due diligence be found, or is outside the state or in federal custody and cannot with due diligence be brought before the court."

This statute has been strictly construed and is limited to the

---

2. That there is such a concern in New York State about the dependability of eyewitness identification testimony is further evidenced by the Court of Appeals' recent holding in *People v Lee* (96 NY2d 157 [2001]), wherein the Court opened the door in limited circumstances to expert testimony regarding the reliability of eyewitness identification.

three types of testimony enumerated therein (*see People v Ayala*, 75 NY2d 422 [1990], *cert denied sub nom. Ayala v Leonardo*, 513 US 888 [1994]). However, a defendant is deemed to have waived his Sixth Amendment right to confront the witnesses against him "where it has been shown that the defendant procured the witness's unavailability through violence, threats or chicanery" (*People v Geraci*, 85 NY2d 359, 365 [1995]; *see also Matter of Holtzman, supra*). Under these circumstances, clear and convincing proof is "required to establish a foundation for the admission of hearsay evidence under this rule" (*Geraci*, 85 NY2d at 366).

In *Matter of Holtzman v Hellenbrand* (92 AD2d at 415), the Court set forth guidelines pursuant to which a defendant's Sixth Amendment right to confrontation and cross-examination may be waived. First, the People must allege specific facts which demonstrate a "distinct possibility" that a criminal defendant's misconduct has induced a witness's unlawful refusal to testify at trial. Then, the People shall have the opportunity to prove that misconduct at a hearing by clear and convincing evidence. Finally, upon the court's affirmative finding of the defendant's misconduct, the defendant will be deemed to have waived any objection to the admissibility of the witness's prior grand jury testimony, which will be admitted into evidence at the trial. The Court of Appeals has embraced and expanded these guidelines and reinforced the more exacting clear and convincing standard of proof defined in *Matter of Holtzman* (*see People v Cotto*, 92 NY2d 68 [1998], *denial of habeas corpus revd on other grounds sub nom. Cotto v Herbert*, 331 F3d 217 [2d Cir 2003]; *People v Geraci, supra*).

Appellant argues the presentment agency did not establish that the witness was unavailable and that the quality of proof admitted at the *Sirois* hearing to establish unavailability consisted of totally untested statements made to the presentment agency's prosecuting attorney and other staff members. Appellant maintains that before an accused can be deprived of his Sixth Amendment right to confront and cross-examine a witness, the prosecution must make good faith efforts to secure the witness's presence before the court.

The record reflects that the complainant appeared at the office of the presentment agency pursuant to a subpoena which was not personally served. She again appeared in court on the date of the fact-finding hearing's scheduled commencement, but, according to the assistant corporation counsel, she refused to testify. The record is devoid of any indication why, after the

court granted the agency's motion for a *Sirois* hearing, the complaining witness was not called to testify at that hearing. While a witness may be deemed unavailable to testify because he or she has fled the jurisdiction, refuses to come to court, is too ill to appear, or has died, none of these circumstances exists here. In fact, there is no reason to believe, based on the record of her past compliance, that the complainant would have refused to obey a subpoena or a material witness order compelling her testimony at a *Sirois* hearing or an in camera conference.

While there is no specific rule dictating that the witness testify in person at a *Sirois* hearing, we believe that fundamental fairness requires a prosecuting body to either produce the witness at the hearing or explain why the witness is unavailable. At the very least, the Family Court should have interviewed the complainant in camera, letting her describe the intimidating incidents and convey her fears firsthand to the court. Notwithstanding that the affirmative waiver of an accused's fundamental constitutional right of confrontation is born of the accused's misconduct, we nonetheless view this as only fair because the end result is that the court admits otherwise incompetent evidence against him or her. The case law supports this position.

In *People v Geraci*, the seminal Court of Appeals case on this issue, and in *People v Cotto*, the intimidated witnesses in both testified at the *Sirois* hearings. In *People v Straker* (173 Misc 2d 949 [1997]), the frightened witness, a former resident of Guyana, did not so testify. However, the prosecutor introduced evidence that Department of Motor Vehicles searches and a financial investigation had failed to reveal the witness's whereabouts and that a check with the United States Embassy in Guyana and the Immigration and Naturalization Service in Guyana had proved fruitless. Thereafter, the People conducted a further investigation which included contact with the Guyanese police, persons in Guyana who knew the witness, and British Airways. This search revealed that the witness had purchased an airline ticket to Guyana on December 28, 1996 (the trial was scheduled for January 21, 1997). He had left New York on December 31, 1996, and on March 14, 1997, was spotted in Guyana by one of the People's civilian contacts (173 Misc 2d at 953-954).

In *People v Perkins* (180 Misc 2d 495 [1999]), the witness refused to respond to a subpoena directing her to appear for the *Sirois* hearing and a material witness order was thereafter

issued. She was arrested, brought to court, and assigned an attorney. Four investigators testified at the hearing that the witness implicated the defendant in a robbery and in the subsequent intimidation which made her fearful to testify at a trial. The witness, through her attorney, alleged she was so traumatized by the threats made against her by defendant's accomplice that she would not testify in defendant's presence. At an in camera proceeding, the witness corroborated "in all respects" the investigators' testimony (at 499). It was only then that the court ruled as admissible at trial the witness's grand jury testimony and out-of-court statements.

Here, the *Sirois* hearing consisted of absolutely no evidence of any sworn statements by the complainant regarding the alleged intimidation or any proof by the presentment agency that she fled the jurisdiction or could not otherwise be located or produced at the hearing. In fact, the record shows she was generally cooperative. We therefore conclude that the presentment agency utterly failed to prove unavailability by clear and convincing evidence.

■ In addition to the agency's failure to establish unavailability, it also failed to satisfy its burden to establish the necessary safeguards to insure that only reliable evidence be admitted at the factfinding. We must emphasize that "unlike most exceptions to the rule against hearsay, the exception at issue here is justified not by the inherent reliability of the evidence [citations omitted], but rather by the public policy of reducing the incentive to tamper with witnesses" (*People v Geraci*, 85 NY2d at 367-368). However, there nonetheless must be some threshold indicia of reliability. Thus, while the Court of Appeals refused to hold that *Geraci* was limited to admitting only prior grand jury testimony at trial,[3] it also held that statements admitted pursuant to *Geraci* "cannot be so devoid of reliability as to offend due process" (*People v Cotto*, 92 NY2d at 78).

The critical evidence against this juvenile was Officer Bonilla's testimony at the *Wade* hearing that described the circumstances leading to and including the station house showup. However, the officer admitted at the *Wade* hearing that all he

---

3. Unsworn statements (*see People v Cotto*, 92 NY2d 68 [1998]) and sworn audiotaped statements (*see People v Straker*, 173 Misc 2d 949 [1997]) have also been found to be admissible if the burden of proof for establishing misconduct has been met (*cf. People v Maher*, 89 NY2d 456 [1997]; *People v Brown*, 166 Misc 2d 539 [1995], *affd* 249 AD2d 556 [1998], *lv denied* 92 NY2d 894 [1998]).

knew about appellant's relationship with the complainant was that she told Bonilla she knew him through her boyfriend. He admitted he did not question her about the nature, the specifics or the circumstances of their relationship, or even about the nature of the relationship between appellant and the complainant's boyfriend. In addition, the final version of the complaint report taken by Officer Bonilla indicated that the complainant "cannot identify person involved in the incident." While Officer Bonilla maintained that was a mistake, the complainant never testified, nor did she make any statements—in or out of court—which addressed her prior relationship with appellant to determine in some reliable way whether the showup was merely confirmatory, and not, as we find, impermissibly suggestive (*see* Point II, *infra*).

Although Officer Bonilla did not testify at the *Sirois* hearing as to the nature of the complainant's out-of-court statements which she made to him, the court nevertheless allowed the statements to be admitted as evidence-in-chief at the fact-finding hearing via the adoption of Bonilla's *Wade* hearing testimony. This was error because, inter alia, the reliability of those statements was never tested in any way before the court admitted them as evidence-in-chief (*contrast People v Cotto, supra*). In *Cotto*, the Court of Appeals found that while statements admitted pursuant to *Geraci* cannot be so devoid of reliability as to offend due process, no such danger was presented in *Cotto*, where the witness's statements were repeated only days after they had first been made, were lucid and credible, and described in detail the defendant's actions both before and after the shooting. In addition, the same statements were made on two separate occasions and recounted in the testimony of two witnesses subject to cross-examination, thus making it unlikely that the witness was misunderstood. Therefore, the Court held that "[t]he statements were thus certainly sufficiently reliable for evaluation by the [factfinder]" (*Cotto*, 92 NY2d at 78).

In sharp contrast, at bar, Police Officer Bonilla, who did not testify at the *Sirois* hearing, gave contradictory testimony at the *Wade* hearing regarding statements the complainant made to him. First, Bonilla testified that she told him her boyfriend knew appellant, and then, on cross-examination, he testified that the complainant told him that she and her boyfriend knew appellant. In addition, Officer Bonilla's explanation of the discrepancy in the complaint report is suspect, at least on this state of the record. In any event, even were we to credit the of-

ficer's explanation, the complaint report itself still does not establish the basis of the alleged relationship between the complainant and appellant. Finally, and most important, the complainant's out-of-court statements to Officer Bonilla led to what, on this record, appears to be an impermissible station house showup (*see* Point II, *infra*).

We find that, under these circumstances, the Family Court impermissibly linked the complainant's out-of-court statements which she made to Officer Bonilla—and which were not examined or in any way tested at the *Sirois* hearing—to her out-of-court statements to ACC Cronk, to which Cronk testified at the *Sirois* hearing. Notably, none of the statements ACC Cronk sought to introduce at the *Sirois* hearing involved the identification procedures employed by the police. Thus, even if the presentment agency had established that the complainant were unavailable to testify at the *Sirois* hearing, the Family Court erred in ruling that Officer Bonilla's *Wade* hearing testimony, which included the complainant's hearsay statements, be admitted as evidence-in-chief at the fact-finding hearing.

## II. Wade Hearing

■ A *Rodriguez* hearing is held to determine whether the identification of a defendant is confirmatory in nature, that is, whether the witness had sufficient familiarity with the defendant to eliminate the issue of police suggestiveness in the identification process. If the court determines that the identification was not confirmatory, then a *Wade* hearing must be held (*see People v Rodriguez*, 79 NY2d 445 [1992]). Although defense counsel requested a *Rodriguez* hearing, the court inexplicably ordered a *Wade* hearing.

In any event, the prosecuting body bears the burden of proof in any case where it claims that a citizen identification procedure was "merely confirmatory" (*id.* at 452). Thus, the prosecutor must establish that "the protagonists are known to one another, or where (as here) there is no mutual relationship, that the witness knows defendant so well as to be impervious to police suggestion" (*id.*). Whether an identification procedure is merely confirmatory is "a question of degree" (*People v Collins*, 60 NY2d 214, 219 [1983]). Accordingly, a prosecutor would be expected to develop at the hearing sufficient details of the extent and degree of the witness's and the accused's prior relationship, their encounters, and how they knew one another, so as to provide the hearing court with a basis for ruling, as a matter of law, that the witness was impervious to suggestion

(*Rodriguez*, 79 NY2d at 451). Thus, "[w]hen a crime has been committed by a family member, former friend or long-time acquaintance of a witness there is little or no risk that comments by the police, however suggestive, will lead the witness to identify the wrong person" (*Collins*, 60 NY2d at 219). A confirmatory identification cannot be based on a prior relationship which is "fleeting or distant" (*id.*; *see also People v Newball*, 76 NY2d 587, 591-592 [1990]).

We agree with appellant that the presentment agency did not meet its burden in establishing that the identification procedure was merely confirmatory. The assistant corporation counsel did not testify that the complainant made any out-of-court statements to her detailing the nature and circumstances of her relationship with or personal knowledge of appellant. As to Officer Bonilla, it was incumbent on the presentment agency to establish that the complainant and appellant were known to each other before the incident, a burden the presentment agency failed to meet. The record leads to the inescapable conclusion that Officer Bonilla simply assumed, without any exploration of the facts, that a prior relationship existed between the two.

Officer Bonilla testified that he did not elicit the number of times the two met before the crime, if any at all; the duration and nature of those encounters, if any; the period of time that elapsed between the crime and previous viewings, if any; and whether they had any conversations. In order to establish whether a prior relationship existed, these matters should be explored. Thus, in *People v Jackson* (159 AD2d 640 [1990], *lv denied* 76 NY2d 790 [1990]), the prosecutor elicited testimony that there was only limited interaction between the witness and the killer for the first time on the night of crime, that there had been no previous or subsequent viewings or encounters between the two in a nonpolice setting, and that the witness professed an inability to identify the defendant at trial. The prosecutor further established that the witness and the defendant were not relatives, friends or longtime acquaintances, and there was no other evidence of familiarity between them in the hearing record. Based on a developed record, the *Jackson* Court found that the evidence adduced at the *Wade* hearing did not demonstrate that the identification of the defendant was merely confirmatory.

Here, Officer Bonilla failed to explore the nature of the relationship. Accordingly, the record was devoid of any factual support for the Family Court's finding that the subsequent sta-

tion house showup identification was merely confirmatory in light of a prior relationship (*cf. People v Bernard*, 188 AD2d 348 [1992] [evidence at *Wade* hearing insufficient to demonstrate that showup identification confirmatory based as it was on nothing more than the police officers' testimony that complainant had informed them that he knew defendant from the neighborhood and that a ruling based on evidence of specific knowledge was required]). However, here, unlike *Bernard*, the error cannot be considered harmless.

Officer Bonilla's contradictory testimony showed, at best, only that the complainant told him that she knew appellant through her boyfriend. Officer Bonilla did not ask her for any details about her boyfriend's connection with appellant (*see People v Johnson*, 169 AD2d 779, 781 [1991], *lv denied* 77 NY2d 996 [1991] [only evidence adduced at *Wade* hearing regarding confirmatory nature of showup procedure was "the rather vague testimony of one of the arresting officers as to what (the identifying witnesses) told him about whether they knew the perpetrators prior to the time of the commission of the crime"]).

The presentment agency's reliance on *Matter of Daniel S.* (207 AD2d 674 [1994]) is misplaced. There, the victim testified that he knew the appellant by his nickname, that he had heard the appellant's friends call him by his nickname, that he had seen him on numerous occasions in the neighborhood, that he knew the block where the appellant lived, and that he did not attend the same school as the appellant because he was somewhat older. Here, in complete contrast, the complainant told Officer Bonilla only that she knew where appellant lived. The record is devoid of any other evidence regarding the nature of their relationship.

Since the presentment agency failed to establish that the complainant's identification of appellant was confirmatory, we must now examine whether the ensuing precinct house showup was unduly suggestive (*see Jackson*, 159 AD2d at 642). It is well settled that "[s]howup identifications, by their nature suggestive, are strongly disfavored" (*People v Riley*, 70 NY2d 523, 529 [1987]; *accord People v Ortiz*, 90 NY2d 533, 537 [1997]). Station house showup procedures in particular "should have almost no place in acceptable identification procedures, unless exigency warrants them" (*Riley*, 70 NY2d at 531; *accord, People v Duuvon*, 77 NY2d 541, 544 [1991] ["civilian showup identifications at police stations are inherently suggestive and should be suppressed as a matter of general principle unless exigency warrants otherwise"]). The People bear the initial "heavy

burden of overcoming the inevitable suggestibility of the combined setting and showup" (*Riley*, 70 NY2d at 531) typically through proof that the showup was "conducted in close geographic and temporal proximity to the crime" (*Ortiz*, 90 NY2d at 537).

Here, the showup did not take place near the crime scene nor did it result from "the culmination of an unbroken chain of fast-paced events" (*People v McCorkle*, 272 AD2d 273, 274 [2000], *lv denied* 95 NY2d 936 [2000]; *accord People v Duuvon*, 77 NY2d at 544-545 ["one unbroken chain of events—crime, escape, pursuit, apprehension and identifications—all within minutes and within a New York City block and a half"]). Rather, Junior, not the complainant, identified appellant at the scene, and appellant was arrested before being taken to the police station (*cf. People v Rojas*, 213 AD2d 56, 70 [1995], *lv denied* 87 NY2d 907 [1995], *order clarified* 247 AD2d 234 [1998] [once identification and arrest had been made there was no need for on-the-scene investigatory showup]; *contrast People v Feliz*, 251 AD2d 134 [1998], *lv denied* 92 NY2d 896, 949 [1998] [first showup conducted within minutes after robberies took place justified, second showup conducted 20 to 30 minutes later at hospital where victim was waiting to be treated for her injuries was still in close temporal proximity to crime and was not rendered unnecessary by defendant's arrest]).

Nor was the station house identification accidental as the complainant did not suddenly encounter appellant (*contrast People v Smallwood*, 294 AD2d 229 [2002], *lv denied* 98 NY2d 772 [2002] [accidental precinct viewing by one of victims not a suggestive police-arranged identification procedure]). Rather, Officer Bonilla found the complainant in another area of the precinct and after questioning her arranged for her to view appellant, who was the only civilian in the room (*see People v Dixon*, 85 NY2d 218, 223 [1995] ["planned identification encounter is distinguishable from those non-police-sponsored identifications resulting from mere happenstance, such as where a witness is present in police headquarters for some purpose other than to effectuate an identification, and by chance views and identifies a suspect who is being processed in another room"]).

Under these circumstances, where there was insufficient proof of the parties' prior relationship, the obvious suggestiveness of the police procedure must be accorded its full detrimental effect, necessitating suppression of the tainted out-of-court identification, as there was no evidence at the suppression

hearing of an independent source (*see Riley*, 70 NY2d at 531-532). Here, the entire case is comprised solely of hearsay evidence, including a brief supporting affidavit which does not address the identification procedure. There is no other evidence of identification. Therefore, we cannot say that admission of the complainant's identification, through the police officer's testimony, which identification occurred at the impermissible showup, was harmless error. Nor could it be said that on this record the proof of appellant's guilt is otherwise overwhelming.

This analysis does not change even in light of appellant's waiver of his right to confront and cross-examine (*see People v Joyner*, 284 AD2d 344, 345 [2001], *lv denied* 96 NY2d 940 [2001] ["(t)hat a witness may have been rendered unavailable due to a defendant's threats or intimidation does not permit the introduction into evidence of a prior identification by that witness which was the product of impermissibly suggestive circumstances which offend due process"]; *see also People v Odenthal*, 216 AD2d 70 [1995], *lv denied* 86 NY2d 799 [1995] [given magnitude of error and less than overwhelming proof against defendant in this single witness identification case, there must be a reversal and new trial]; *People v Rojas*, 163 AD2d 1 [1990] [error in admission of challenged evidence was of constitutional magnitude and must be shown harmless beyond a reasonable doubt if conviction allowed to stand]; *People v Perez*, 127 AD2d 707 [1987] [where conviction based upon identification testimony by a single witness who made a brief observation of assailant under less than ideal circumstances, any error which is apt to enhance weight of such testimony may not be disregarded as merely technical in nature]; *contrast People v Bernard, supra* [in view of overwhelming independent evidence of guilt other than complainant's in-court identification of defendant, court's suppression error was harmless]).

We believe that on remand the presentment agency should be afforded an opportunity to present evidence of independent source at a new pretrial hearing as its failure to present such proof "is apparently attributable to the motion court's erroneous ruling as to the admissibility of the station house showup identification[ ]" (*People v Laffman*, 161 AD2d 111, 113 [1st Dept 1990]; *contrast People v Jackson*, 159 AD2d at 643 [2d Dept 1990] [because trial record does not contain sufficient independent evidence of defendant's *identification* as the person who committed the charged offenses, the indictment must be dismissed]).

### III. *The Fact-Finding Hearing*

█ The only evidence which may be admitted at a fact-finding hearing is that which is "competent, material and relevant" (Family Ct Act § 342.2 [1]). Appellant maintains that the Family Court erred in allowing, over objection, the police officer's *Wade* hearing testimony to be admitted as evidence-in-chief at the factfinding in the absence of compliance with CPL 670.10 (1). However, the Court of Appeals has explicitly held that CPL 670.10 (1) is inapplicable to *Wade* hearings (*see People v Ayala, supra*). Therefore, CPL 670.10 (1) would not provide a basis for admitting such testimony.

The presentment agency maintains that it was within the court's discretion to admit the officer's *Wade* hearing testimony as a substitute for his fact-finding testimony. However, the presentment agency's reliance on *People v Almonor* (93 NY2d 571 [1999]) and *People v Sorge* (301 NY 198 [1950]) is wholly misplaced as neither applies here.[4] The issue at bar is whether prior testimony adduced at a hearing wherein hearsay is admissible can be introduced as a substitute in a later fact-finding hearing where a higher burden of proof (i.e., the reasonable doubt standard) and stricter rules of evidence apply. The presentment agency has failed to demonstrate the officer's *Wade* hearing testimony was otherwise admissible at the fact-finding hearing. Accordingly, the court's erroneous admission of the officer's suppression testimony requires reversal, not only because the *Wade* hearing testimony is not the type admissible by CPL 670.10 (1), but also because the officer was not unavailable within the statute's meaning.

Accordingly, the order of disposition of the Family Court, Bronx County (Myrna Martinez-Perez, J.), entered on or about March 15, 2002, which adjudicated appellant a juvenile delinquent, upon a fact-finding determination rendered February 21, 2002, that he had committed acts which, if committed by an adult, would constitute menacing in the second and third degrees, and placed him with the Office of Children and Family Services for a period of 12 months, should be reversed, on the

---

4. In *People v Almonor*, the issue was whether, in an assault prosecution, the trial court had discretion to preclude the defendant from introducing a portion of his psychiatric evidence that related to lack of assaultive intent where the defendant, despite the court's warning and ongoing prosecution requests, refused to identify to the prosecution which category of defense set forth in the statute he intended to rely on. In *People v Sorge*, the issue was whether, in an abortion prosecution, the trial court abused its discretion in permitting sustained cross-examination of the defendant with respect to previous abortions allegedly performed by her or in her presence and with respect to a previous conviction of practicing medicine without a license.

law and the facts, without costs, the fact-finding determination vacated and the matter remanded for further proceedings not inconsistent with this opinion.

ANDRIAS, J.P., ROSENBERGER and GONZALEZ, JJ., concur.

Order of disposition, Family Court, Bronx County, entered on or about March 15, 2002, reversed, on the law and the facts, without costs, the fact-finding determination vacated and the matter remanded for further proceedings not inconsistent with the opinion.