People v Sargeant (2025 NY Slip Op 06361)

People v Sargeant

2025 NY Slip Op 06361

Decided on November 20, 2025

Court of Appeals

Troutman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 20, 2025

No. 95

[*1]The People & c., Respondent,
v
Derek Sargeant, Appellant.

Sarah B. Cohen, for appellant. 
Danielle O'Boyle, for respondent. 
District Attorneys Association of the State of New York, amicus curiae.

TROUTMAN, J.:
Since 1777, the Constitution of the State of New York has guaranteed those subject to criminal prosecution the right to trial by a jury of 12 persons (see 1777 NY Const art XLI). The question before us is whether a defendant may forfeit that right by engaging in misconduct. We hold that in these exceedingly rare circumstances where there was clear and convincing evidence that defendant engaged in egregious conduct affecting a sworn juror after the jury commenced its deliberations, requiring the discharge of that juror, defendant forfeited the right to a jury of 12 persons and, there being no alternate jurors to substitute for the dismissed juror, the trial court did not abuse its discretion in proceeding with the remaining 11 jurors.
I.

Defendant engaged in a violent confrontation with a 20-year-old escort in the basement of his Queens home. The victim called 911 from outside the home. The police responded and, upon executing a search warrant at the home, recovered two revolvers, 81 rounds of ammunition, two machetes, brass knuckles, 2,513 blank credit cards concealed behind a wall panel, "retransfer ribbons" that are used for printing on plastic cards, and a police scanner. A grand jury indicted defendant of, inter alia, assault in the third degree (Penal Law § 120.00 [1]), criminal obstruction of breathing or blood circulation (id. § 121.11), criminal possession of a weapon in the second degree (id. § 265.03 [1] [b], [3]), and criminal possession of forgery devices (id. § 170.40 [2]).
A jury trial ensued. From January 15 to 18, 2019, the People presented their case-in-chief. During that period, the court dismissed a juror for reasons unrelated to any conduct of defendant and replaced him with the only alternate juror, leaving no remaining alternate jurors. On the next day of trial, January 22, the People finished presenting their evidence and rested, after which defendant testified on his own behalf and rested. On January 23, the parties' counsel gave summations, the court charged the jury on the law, and the jury began deliberating.
On the morning of January 24, defense counsel reported that defendant had a severe migraine and could not meaningfully participate in the proceedings. Counsel explained that defendant had complained of a migraine the day before but stated that he felt better after taking medication. In the morning, however, defendant claimed to still be experiencing a migraine despite having taken the medication again. Counsel asked the court to suspend deliberations until the following day. The court directed defendant to contact his counsel after going to urgent care and to come back the next morning. The court adjourned.
That afternoon, however, the court received a call from the jury foreperson, who said that "something happened" and he could no longer be impartial. In addition, a Brooklyn assistant district attorney (ADA), who was uninvolved in the case but was a friend of the foreperson, reported to the court that the foreperson called him earlier in the day and said that defendant had confronted him at his home. The court reconvened in the afternoon with both counsel present to inform them of those calls, issued a warrant for defendant's arrest, and promised to address the issues in the morning.
On the morning of January 25, the court convened a hearing pursuant to People v Buford (69 NY2d 290 [1987]). The court asked an officer to bring the foreperson into the courtroom for the hearing and, in the meantime, stated that the foreperson had been segregated from the other 11 jurors, who had been instructed to cease their deliberations.[FN1]
The officer then returned to the courtroom and informed the court that the foreperson was uncomfortable coming into the courtroom. With the parties' consent, the court spoke to the foreperson privately about the necessity of the hearing, at which point the foreperson agreed to participate.
The foreperson testified that the court adjourned at around 1:00 the day before and, at around 1:25, he took a rideshare home. Outside the gate to his home, a man approached him "on behalf of" defendant and said that defendant was innocent and "being extorted." The man handed him documents, three of which the foreperson produced for the court. The foreperson asked how the man knew where he lived; the man said: "Public records." The foreperson testified that he was unsure if the man was the same person as defendant and denied telling the ADA that it was defendant. He described the man as the same height as himself, of indeterminate race, dark-skinned but lighter than himself, average build, and wearing a hat, sunglasses, and a jacket with a high collar. In addition, it was overcast and rainy. The whole interaction lasted under a minute, after which the foreperson went inside and called the ADA "in a bit of a panic," concerned for his family's safety. He then contacted the court on the ADA's advice. He testified that he could not be impartial. With the agreement of the parties, the court discharged him from the jury, reminded him that the case was ongoing, and instructed him not to speak to anyone about his experience.
The People moved to proceed to verdict with the remaining 11 jurors. They argued that defendant had forfeited his right to trial by a jury of 12 by intentionally procuring the foreperson's absence. The People observed that the foreperson was "extremely upset" on the witness stand and argued that he had not identified defendant in court as the one who approached him because he was afraid to do so. The People noted that the documents that were handed to the foreperson were legal documents to which defendant had access, and that defendant had not come to court with proof that he had gone to urgent care. The People argued that, in light of this clear and convincing evidence of defendant's "egregious" misconduct, defendant forfeited the right to a jury of 12. Defendant declined to waive his right to trial by a jury of 12 and moved for a mistrial on the ground that it would be "inappropriate" to continue with 11 jurors. Before deciding the motion, the court heard testimony from the ADA who received the foreperson's call. He provided testimony consistent with that of the foreperson, except that he testified that, during [*2]their phone conversation immediately after the incident, the foreperson unequivocally identified defendant as the man who approached him.
The court granted the People's motion and denied a mistral. In a written decision, the court expressed "no doubt" that defendant personally confronted the foreperson at his home, observing that the foreperson's description of the man matched defendant and that the documents handed to the foreperson were part of defendant's discovery. Furthermore, the court found that defendant had feigned illness on January 23 to make his later claims of illness more credible in order to secure an early recess and confront the foreperson at his home on January 24. The court credited the ADA's testimony that the foreperson had identified defendant as the one who confronted him and found that the foreperson's equivocal testimony was a result of the "overwhelming fear" he felt for his family's safety. The court also found that defendant had orchestrated the confrontation in an attempt to improperly influence the jury's deliberations.
In concluding that defendant had forfeited his right to trial by a jury of 12, the court relied on federal and state cases concerning forfeiture of constitutional rights generally and federal and state cases permitting verdicts by juries composed of 11 persons. The court likened defendant's act of jury tampering to cases of witness tampering wherein defendants have been found to have forfeited their right to confrontation. The court applied the standards for forfeiture of that right as set forth in People v Geraci (85 NY2d 359 [1995]) and found by clear and convincing evidence that defendant, believing he could obtain a favorable verdict or a mistrial, intentionally engaged in jury tampering, conduct that resulted in the foreperson's inability to continue to serve as a juror. The court thus concluded that defendant forfeited his right to trial by a jury of 12, and it further concluded that continuing trial with the remaining 11 jurors was reasonable and justifiable.
The 11-person jury found defendant guilty of, inter alia, one count of criminal possession of a weapon in the second degree and two counts of criminal possession of forgery devices but acquitted him of, inter alia, two counts of criminal possession of a weapon in the second degree, one count of criminal possession of forgery devices, and the count of criminal obstruction of breathing or blood circulation.
The Appellate Division affirmed, applying the standard adopted by the trial court and concluding that defendant had forfeited his right to trial by a jury of 12 through his "egregious" misconduct (230 AD3d 1341, 1349-1353 [2d Dept 2024]). A dissenting Justice, while agreeing that a defendant may forfeit constitutional rights through misconduct and that defendant's misconduct was egregious, rejected the majority's comparison of juror tampering to witness tampering and opined that the forfeiture of the right to a jury of 12 is more akin to a forfeiture of the right to counsel, which requires persistent misconduct and occurs "only as a matter of extreme, last-resort analysis" (id. at 1356-1357 [internal quotation marks and ellipsis omitted]; see People v Smith, 92 NY2d 516, 521 [1998]). The dissent reasoned that "a juror, like counsel, is replaceable," and thus "one strike is not enough" to support a forfeiture of this right to a jury of 12 persons (230 AD3d at 1356-1357)[FN2].
II.

Centuries before our country's founding, the common law afforded those accused of serious offenses a trial by a jury of 12 (see Williams v Florida, 399 US 78, 86-89 [1970]; see also Khorrami v Arizona, 598 US &mdash, 143 S Ct 22, 23 [2022, Gorsuch, J., dissenting]). Colonial New York codified the common-law right to a jury of 12 over a century before the ratification of the U.S. Constitution (see Charter of Liberties and Privileges § 17 [1683], reprinted in 1 Lincoln, Constitutional History of New York, at 101-102 ["All Tryalls shall be by the verdict of twelve men"]), and our first State Constitution guaranteed that the right to a "trial by jury, in all cases in which it hath heretofore been used in the colony of New York, shall . . . remain inviolate forever" (1777 NY Const art XLI). Our State Constitution continues to guarantee that the right to trial by jury "in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever" (NY Const, art I, § 2). We have interpreted those provisions " 'as guaranteeing the right to trial by jury as it had existed at common law' " [*3](People v Page, 88 NY2d 1, 5 [1996], quoting People v Ahmed, 66 NY2d 307, 311 [1985]). Because a jury at common law consisted of 12 persons, we have long held that defendants accused of felonies have a constitutional right to a trial by a jury of 12 persons (see id. at 5; Cancemi v People, 18 NY 128, 135 [1858]).
Originally, the right was held to be absolute. In 1858, we interpreted the constitutional right to a jury in a criminal trial to mean that a verdict by a jury of 11 could not be sustained even where the defendant had consented to it (see Cancemi, 18 NY at 138). But, in later years, "the efficacy of a ban on jury trial waivers in criminal cases" came into question (People v Gajadhar, 9 NY3d 438, 443 [2007]). In 1935, the Judicial Council proposed amending the Constitution to permit a waiver of the right to a jury in a criminal trial, expressing "little doubt" that the permissible waiver of that right would be "a desirable and valuable part of criminal procedure" with benefits to the public including the elimination of the "dangers of a mistrial" (2d Rep of NY Jud Council, at 100-101, reprinted in 1936 NY Legis Doc No. 48 [C], at 6-7; see Gajadhar, 9 NY3d at 443-444). Three years later, the Constitution was amended to that effect (see Gajadhar, 9 NY3d at 444), and later that year the 1938 Constitution was enacted with the current provision, which requires that a waiver be accomplished in writing in open court with the permission of the trial judge (see NY Const, art I, § 2; Gajadhar, 9 NY3d at 444). In 1961, a provision was added to the Judiciary article of the Constitution expressly providing that "crimes prosecuted by indictment shall be tried by a jury composed of [12] persons, unless a jury trial has been waived as provided in" article 1, § 2 (NY Const, art 6, § 18).
In Gajadhar, we sustained an 11-person verdict where defendant waived his rights in compliance with the Constitution (see 9 NY3d at 448). Whereas in Cancemi we held that the composition of a jury of 12 was not a right personal to the defendant but a fundamental "mode of proceeding" affecting the whole community, given the public interest in criminal prosecutions (18 NY at 136-138; see Gajadhar, 9 NY3d at 449 [Ciparick, J., dissenting]), in Gajadhar we reasoned that the Constitution's "evolving text" since Cancemi made the 12-person jury a right "personal to the accused" (9 NY3d at 446-448). Because the constitutional amendments and decisions since Cancemi transformed the constitutional guarantee of a jury of 12 into a personal right, defendant may waive the right or, in a case such as this one, forfeit it by engaging in misconduct.
To be sure, Gajadhar involved a waiver in compliance with the specific procedures outlined in the Constitution, whereas here we are concerned with the forfeiture doctrine. Waiver and forfeiture are distinct but related concepts. Waiver is a knowing, intelligent, and voluntary relinquishment of a known right (see People v Parker, 57 NY2d 136, 140 [1982]). Forfeiture, on the other hand, results from misconduct that "unambiguously indicate[s] a defiance of the processes of law" (People v Sanchez, 65 NY2d 436, 444 [1985]) and ensures that "the governmental prerogative to proceed with a trial may not be defeated by conduct of the accused that prevents the trial from going forward" (id. at 443 [internal quotation marks omitted]; see Illinois v Allen, 397 US 337, 349 [1970, Brennan, J., concurring]). A forfeiture is based on the principle that, as a matter of public policy, the Constitution does not protect defendants from "the legitimate consequences of [their] own wrongful acts" (Reynolds v United States, 98 US 145, 158 [1878]; see Sanchez, 65 NY2d at 443).
Whether forfeiture applies to the right to a jury of 12 is an issue of first impression, but forfeiture has been applied to many constitutional rights in the criminal procedure context. For example, a defendant may forfeit the right to counsel by engaging in " 'egregious conduct,' " albeit "only as a matter of 'extreme, last-resort . . . analysis' " in cases involving brutal, violent, or persistent abuse (People v Shanks, 37 NY3d 244, 253-254 [2021]; see People v Wilkerson, 294 AD2d 298, 298 [1st Dept 2002], lv denied 98 NY2d 772 [2002]). Use of "violence, threats or chicanery" to make a witness unavailable may result in the forfeiture of the right to confront the witness (People v Geraci, 85 NY2d 359, 365-366 [1995]). A defendant may forfeit the right to be present at all stages of trial by engaging in courtroom conduct so disruptive that the trial cannot proceed in their presence (see People v Byrnes, 33 NY2d 343, 349 [1974]). Likewise, a pro se defendant's disruptive conduct may result in the forfeiture of the right to self-representation (see People v McIntyre, 36 NY2d 10, 18 [1974]).
We see no reason to exclude the right to trial by a jury of exactly 12 persons from the universe of forfeitable rights. While the reason the common law settled on that precise figure is lost to history (see People v Cosmo, 205 NY 91, 96 [1912]), we cannot say that the precise number is any more crucial to protecting defendants than the rights we have already determined may be forfeited. There can be no serious debate that the assistance of counsel "is essential to assure the defendant a fair trial" because, in the vast majority of criminal prosecutions, "defendants could better defend with counsel's guidance than by their own unskilled efforts" (Faretta v California, 422 US 806, 832-834 [1975]). And, without the right to confront one's accusers, juries may convict defendants based on out-of-court statements by witnesses who cannot be cross-examined (see Crawford v Washington, 541 US 36, 61-62 [*4][2004]). If a defendant may forfeit those essential constitutional rights by engaging in misconduct, the same is true of the right to a jury of precisely 12.
Moreover, the public policy rationales that motivated the enactment of the constitutional waiver provisions are relevant in the context of a potential forfeiture as well. By eliciting a waiver of the right to a jury of 12, the court may avoid the necessity of a mistrial in a Cancemi- or Gajadhar-like scenario (see 2d Rep of NY Jud Council, at 101). Likewise, a mistrial may be avoided where a defendant's misconduct is sufficient to effect a forfeiture of the right. Permitting forfeiture thus advances the public policy goals of promoting justice and effective and efficient management of the justice system, as well as the additional public policy goals of preserving the integrity of the justice system and barring defendants from benefiting from their own misconduct.
Contrary to defendant's contention, we see no impediment to forfeiture in the constitutional text, which provides that the right "shall remain inviolate forever" (NY Const, art I, § 2). Whatever effect that language has, which may indeed narrow the circumstances that suggest the loss of this constitutional right as compared to others, it does not on its face preclude forfeiture. While an explicit source of the 12-person jury right is found in an entirely different constitutional provision (see NY Const, art 6, § 18), that provision does not require a different result. In context, the provision is most naturally read as a limitation on the legislature's power to alter the composition of juries in felony trials, to which section two of article one continues to apply. There is no evidence that the provision was intended to alter the substantive scope of criminal trial rights.
III.

Having decided that the constitutional right to trial by a jury of 12 is subject to forfeiture, we must next consider whether defendant's misconduct here was sufficient to effect a forfeiture of that right. We conclude that it was. In doing so, we must resolve the question that split the Appellate Division concerning the proper standard. In adopting the demanding standard that we do today, we stress that our opinion is not an invitation to courts to convene trials by fewer than 12 jurors on a routine basis. Indeed, in the 342 years that the right to trial by a jury of 12 persons has been codified in New York, we know of no other cases that involve forfeiture of that right, a fact that underscores how exceedingly rare are the circumstances that justify a forfeiture.
We conclude that only " 'egregious conduct' " toward a sworn juror can result in a forfeiture of the right to a jury of 12 (Shanks, 37 NY3d at 253). Black's Law Dictionary defines "egregious" as "[e]xtremely or remarkably bad" or "flagrant" (Black's Law Dictionary 652 [11th ed 2019]). The Merriam-Webster Online Dictionary defines "flagrant" as "conspicuously offensive," and especially as "so obviously inconsistent with what is right or proper as to appear to be a flouting of law or morality."[FN3] Conduct cannot be deemed egregious unless it rises to this level. The fact that a juror might refuse to continue jury service due to a defendant's bad behavior will not be sufficient by itself to establish egregious conduct.
While the removal of a deliberating juror is not a sufficient condition of a forfeiture, it is most assuredly a necessary condition. For as long as a lawful jury of 12 exists or can be composed through the lawful substitution of an alternate juror, the court has no occasion to consider questions of forfeiture. We thus consider the timing of defendant's misconduct here to be an important factor. Defendant's misconduct occurred after the jury had already begun its deliberations. At that stage of trial, the court ordinarily lacks the constitutional authority to unilaterally substitute an alternate juror for a juror who had been discharged (see People v Ryan, 19 NY2d 100, 104-105 [1966] [reasoning that the substitution of an alternate juror during deliberations violates the right to a jury of 12 because it involves the introduction of a 13th juror and thus can occur only if the defendant waives the right in accordance with the constitutional procedures]; see also CPL 270.35 [1] [codifying that requirement]).
Of course, the timing of the misconduct is but one factor to consider in determining whether it was sufficiently egregious to result in a forfeiture. Here, the totality of the facts and circumstances demonstrates the egregiousness of defendant's conduct. He did not merely protest his innocence to a sitting juror or leave court papers at the jurors home. His conduct was not accidental or spontaneous but instead involved a great deal of preplanning over at least two days. He searched public records for juror's home address and confronted the juror outside his front gate, wearing a disguise and pretending to [*5]be someone else. He also deceived the court and his own counsel in feigning a medical condition so that he would have the afternoon free to confront the juror at his home. Defendant thus undertook a persistent course of conduct revealing a deliberate and methodical attempt to interfere with the impartial nature of the jury. He violated the juror's privacy and the sanctity of his home and in doing so reasonably and foreseeably, and perhaps intentionally, caused the juror to fear for the safety of his family. Defendant's behavior, viewed in totality, is so clearly performed with aforethought and so inappropriate as to place his misconduct well outside the realm of ordinary bad behavior. Even the dissenting Justice below conceded defendant's "egregious and unacceptable" misconduct (230 AD3d at 1357).
We reject defendant's argument, adopted by the dissenting Justice below, that "one strike is not enough" to effect a forfeiture of the right to a jury of 12 (id.). What matters is the egregiousness of the conduct, not its frequency. We decline to adopt a standard that requires the court to declare a mistrial and empanel a new jury of 12 in all circumstances, no matter how egregious a defendant's conduct may be, on the theory that jurors are "replaceable" (id. at 1356). Jurors are ordinary citizens who are volunteered into a process that creates an often-unwanted disruption to their lives, for which they are paid a modest stipend. They are entitled to greater respect than to be treated as replaceable parts in a system designed to protect the rights of a defendant who, in circumstances such as these, exhibits no respect for the jurors' sacrifices, the system, or even his own rights.
IV.

We thus conclude that a defendant who engages in egregious conduct affecting a sworn juror after the jury has commenced its deliberations, requiring the discharge of that juror, forfeits the right to a jury of 12. It does not necessarily follow, however, that the appropriate course of action in every instance is to proceed to verdict with a jury of fewer than 12 persons. There will be cases where it is appropriate for the court to declare a mistrial despite a defendant's misconduct directed towards the jury or to impose some less drastic sanction [FN4]. Courts must decide how to proceed on a case-by-case basis, giving due consideration to all the facts and circumstances, and the decision is one we commit to the sound discretion of the trial court.
In finding no abuse of discretion here, we think it is important that there were no alternate jurors available.
Based upon these facts and circumstances, we hold that the court properly exercised its discretion in proceeding with the remaining 11 jurors.
Accordingly, the Appellate Division order should be affirmed.
Order affirmed. Opinion by Judge Troutman. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro and Halligan concur.
Decided November 20, 2025

Footnotes

Footnote 1: We commend the court's attention to the situation as it arose. By segregating the foreperson from the other 11 jurors, the court took affirmative steps to ensure that the experience of the foreperson did not taint the rest of the jury and thereby arguably create an independent ground for a mistrial.

Footnote 2: The majority and dissent agreed that defendant's claim under the Sixth and Fourteenth Amendments of the federal Constitution fails under Williams v Florida (399 US 78 [1970]), and we reject that claim for the same reason. The dissent also concluded there were violations of substantive and procedural due process (see 230 AD3d at 1357-1358), but to the extent defendant has preserved such a challenge he has abandoned it by failing to pursue it in his brief.
Footnote 3: Merriam-Webster Online Dictionary, flagrant (http://www.merriam-webster.com/dictionary/flagrant) (accessed Nov. 11, 2025).
Footnote 4: Tampering with a juror is itself a misdemeanor offense that can be separately charged and prosecuted (Penal Law §§ 215.23, 215.25), along with any other crimes independently committed through the misconduct.